**Michael B. Merchant**, OSB No. 882680
mike.merchant@bhlaw.com
BLACK HELTERLINE LLP
805 S.W. Broadway, Suite 2600
Portland, OR 97205
Telephone: (503) 224-5560
Facsimile: (503) 224-6148

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| ERIC MARCUS, derivatively on behalf of KINDERCARE LEARNING COMPANIES, INC., | Case No. 3:26-cv-00568 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | 15 U.S.C. § 78n(a)(1); 15 U.S.C. § 77k(f)(1); 15 U.S.C. § 78u-4(f); Breach of Fiduciary Duty; Unjust Enrichment; Abuse of Control and Gross Mismanagement; Waste |
| PAUL THOMPSON, ANTHONY AMANDI, JOHN T. WYATT, JEAN DESRAVINES, CHRISTINE DEPUTY, MICHAEL NUZZO, BENJAMIN RUSSELL, JOEL SCHWARTZ, ALYSSA WAXENBERG, and PRESTON GRASTY, | |
| Defendants, | DEMAND FOR JURY TRIAL |
| and | |
| KINDERCARE LEARNING COMPANIES, INC., | |
| Nominal Defendant. | |

Page 1 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

**INTRODUCTION**

Plaintiff Eric Marcus ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant KinderCare Learning Companies, Inc. ("KinderCare" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Paul Thompson ("Thompson"), Anthony Amandi ("Amandi"), John T. Wyatt ("Wyatt"), Jean Desravines ("Desravines"), Christine Deputy ("Deputy"), Michael Nuzzo ("Nuzzo"), Benjamin Russell ("Russell"), Joel Schwartz ("Schwartz"), Alyssa Waxenberg ("Waxenberg"), and Preston Grasty ("Grasty") (collectively, the "Individual Defendants" and together with KinderCare, the "Defendants") for breaches of their fiduciary duties as directors and officers of KinderCare, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding KinderCare, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Page 2 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by KinderCare's officers and directors from October 9, 2024 through November 12, 2025, both dates inclusive (the "Relevant Period").

2.     KinderCare is a Delaware corporation based in Lake Oswego, Oregon, chiefly engaged in the early education and childcare services ("ECE") industry. According to the Company, it is the largest provider in the United States ECE market by center capacity.

3.     The Company's services are directed towards children between the ages of 6 weeks and 12 years of age and are offered through the following Company brands: (1) KinderCare Learning Centers ("KCLC"); (2) Crème School; and (3) Champions. The Company currently operates over 1,500 ECE facilities with an aggregate total capacity of over 200,000 children.

4.     Among the Company's key metrics are its full-time enrollment rate ('FTE"), and its ECE same-center occupancy rate, which is defined in the Offering Documents as "as the average weekly ECE same-center enrollment divided by the total of the ECE same-centers' capacity during the period" (the "Occupancy Rate").

5.     A large portion of the Company's revenue is derived from federal subsidies, accounting for over one-third of its revenue prior to the Company's initial public offering conducted on October 9, 2024 ("the IPO"). The subsidies which the Company receives are largely pursuant to the federal Child Care and Development Block Grant Act of 1990, 42 U.S.C. §§ 9857 et seq. (the "CCDBGA"). The CCDBGA sets forth multiple eligibility requirements to receive subsidies under the act, including qualifications for staff members and mandatory child-

to-teacher ratios. Moreover, the CCDBGA sets forth mandatory reporting requirements for child abuse at recipient facilities.

6.      On October 9, 2024, backed by the Switzerland-based investment management firm and private equity group Partners Group Holding AG ("Partners Group"), the Company conducted the IPO. During the course of the IPO, the Company sold a total of 27.6 million shares of Company common stock at $24 per share. Notably, this figure included the Company's underwriters' exercise of options to sell an additional 3.6 shares of Company common stock. The IPO yielded net proceeds of over $600 million.

7.      In connection with the IPO, the Company filed the following documents with the SEC, collectively referred to as the "Offering Documents": (1) a registration statement for the IPO on Form S-1 filed by the Company on September 6, 2024, as amended on September 30, 2024 and October 7, 2024, and declared effective on October 8, 2024 (the "S-1 Registration Statement"); (2) a description of the Company's common stock filed by the Company on October 9, 2024 on Form 8-A (the "Form 8-A"); (3) a registration statement filed by the Company on Form S-8 for the Amended and Restated 2022 Incentive Award Plan and the 2024 Employee Stock Purchase Plan, discussed in the S-1 Registration Statement and incorporated by reference the S-1 Registration Statement, the Form 8-A, and the Prospectus (defined below) (the "S-8 Registration Statement" and together with the S-1 Registration Statement, the "Registration Statement")); and (4) a prospectus filed by the Company on Form 424B4 on October 9, 2024, incorporated into and forming part of the Offering Documents (the "Prospectus").

8.      The Offering Documents of the Company's IPO contained several assertions pertaining, *inter alia*, to: (1) the Company's commitment to upholding state health and safety regulations; (2) the importance to the Company's financial prospects of expanding enrollment

Page 4 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

rates; and (3) the Company's commitment to attracting and retaining high-quality staff members through competitive compensation.

9.    For example, the Offering Documents quoted Defendant Thompson as stating that the Company's "*rigorous safety standards across all classrooms are reinforced by ongoing training and measurement tools*"[1] Moreover, the Offering Documents stated that, at the time of the IPO, the Company was "*continuing to comply with applicable laws and regulations*," including "*minimum qualifications and background checks for our center personnel as well as* teacher-*to-child ratios and various health [] and safety regulations*."

10.    In addition, the Offering Documents asserted that the Company's "*industry-first talent filter helps us hire the best teachers and center staff*," and that the Company was offering "*competitive compensation*" to attract and retain high-quality teachers and staff members.

11.    However, in reality, the Company consistently acted in contradiction to the statements made in the Offering Documents. Leading up to and continuing after the IPO, the Individual Defendants either made or caused the Company to engage in various forms of conduct that violated state health and safety regulations, violated state labor regulations, and, *inter alia*, resulted in numerous lawsuits and state regulatory actions against the Company.

12.    As revealed in the Consolidated Amended Complaint in the Securities Class Action captioned *In re KinderCare Learning Companies, Inc. Securities Litigation*, Case No. 3:25-cv-01424-AR, in the United States District Court for the District of Oregon (the "Consolidated Class Action Complaint"), a detailed investigation was conducted into state databases pertaining to ECE facilities reports, known as "Monitoring and Inspection Reports" (the "Monitoring & Inspection Investigation"). The Monitoring & Inspection Investigation

---

[1] Unless otherwise stated, all emphasis is added.

Page 5 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

determined that, between January 1, 2024 and October 9, 2024 (the nine-month period preceding the IPO), 680 Company KCLC facilities in the United States received an aggregate of nearly 2,000 state health and safety violations. This figure represented roughly 45% of Company KCLC facilities during the nine-month period stated above.

13.    Moreover, as of February 6, 2026, fifteen separate lawsuits have been filed against KinderCare by former students of the Company's facilities and their families. The allegations within these lawsuits range from negligent supervision to outright sexual abuse committed by Company staff members. In addition, the Company has been subjected to five additional lawsuits by former Company employees who allege that the Company retaliated against them for acting to prevent health and safety violations at Company facilities and for reporting such violations.

14.    Also in contradiction of the assertions made in the Offering Documents, the Company both consistently offered below market compensation rates for its employees and failed to properly compensate existing employees. These findings were corroborated by former employees of the Company, as well as agreements between the Company and the Massachusetts Attorney General to pay restitution and civil penalties for violations of Massachusetts labor laws.

15.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to KinderCare, willfully or recklessly made and/or caused the Company to engage in various forms of conduct that violated numerous state health and safety regulations as well as state labor regulations, and, *inter alia*, resulted in a multitude of lawsuits and state regulatory actions against the Company. Specifically, the Individual Defendants willfully or recklessly caused the Company to, *inter alia*: (1) offer inadequate compensation to employees; (2) as a result of inadequate compensation offers, the Company was unable to hire, train, and

Page 6 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

retain high-quality staff members at its facilities; (3) as a result of the foregoing, a substantial number of Company facilities violated various state health and safety regulations; (4) a significant portion of the Company's health and safety violations at its facilities included serious bodily harm to children under the Company's care or resulted in the termination of Company employees; (5) the Company retaliated against employees who reported or raised concerns about health and safety violations at Company facilities; and (6) the Company failed to fully compensate numerous employees (collectively, the "Safety and Labor Misconduct").

16. The Safety and Labor Misconduct resulted in, *inter alia*, the decline in enrollment at Company facilities, and as such the disclosure of lackluster enrollment growth suggested that the actions of the Company and the Individual Defendants did not reflect the assertions made in the Offering Documents.

17. The truth about the Safety and Labor Misconduct began to emerge on November 20, 2024, after the market closed, when the Company hosted an earnings call to discuss its financial results for the third quarter of the 2024 Fiscal Year[2] with investors and analysts (the "Q3 FY 2024 Earnings Call"). During the Q3 FY 2024 Earnings Call, the Individual Defendants disclosed that "same center enrollment growth" was "***relatively flat***."

18. On this news, the price per share of the Company's stock fell $3.43, or approximately 15%, from a price per share of $22.80 at the close of trading on November 20, 2024 to close at $19.37 at the close of trading on November 21, 2024.

---

[2] KinderCare's fiscal year does not mirror the calendar year, but instead comprises a 52- or 53-week period, with each fiscal year ending on the Saturday closest to December 31.

For the period between January 1, 2023 and December 30, 2023, the "2023 Fiscal Year."

For the period between December 31, 2023 and December 28, 2024, the "2024 Fiscal Year."

For the period between December 29, 2024 and January 3, 2026, the "2025 Fiscal Year."

Page 7 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

19.    The truth continued to emerge about the Safety and Labor Misconduct on April 3, 2025, when research analyst Edwin Dorsey issued a report regarding the Company, titled "Problems at KinderCare Learning Companies (KLC)" in the newsletter "The Bear Cave" (the "Bear Cave Report"). The Bear Cave Report noted, *inter alia*, that "[t]he Bear Cave finds that *KinderCare often fails to deliver the safe and nurturing environment it promises parents and taxpayers*."

20.    On this news, the price per share of the Company's stock fell $1.59, or approximately 12.4%, from a price per share of $12.78 at the close of trading on April 2, 2025 to close at $11.19 at the close of trading on April 3, 2025.

21.    The truth finally fully emerged on November 12, 2025, when the Company issued a press release to announce its financial results for the third quarter of the 2025 Fiscal Year. That same day, the Company hosted an earnings call to discuss its financial results for the third quarter of the 2025 Fiscal Year with investors and analysts (the "Q3 FY 2025 Earnings Call"). During the Q3 FY 2025 Earnings Call, Defendant Amandi stated that "it's clear the recovery in enrollment occupancy is going to take longer than we expected."

22.    On this news, the price per share of the Company's stock fell $0.96, or approximately 19.2%, from a price per share of $5.00 at the close of trading on November 12, 2025 to close at $4.04 at the close of trading on November 13, 2025. As the market continued to react to the Company's disclosures, the price per share of its stock fell an additional $0.09, or approximately 2%, from a price per share of $4.04 at the close of trading on November 13, 2025 to close at $3.95 at the close of trading on November 14, 2025.

23.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series

Page 8 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company engaged in the Safety and Labor Misconduct; (2) the Company's violations of state laws and regulations resulted in the substantial withdrawal of families from its facilities; (3) the withdrawal of families from Company facilities would negatively impact the Company's enrollment figures; (4) as a result, the Offering Documents' risk statements were not merely speculative given that purported risks had already occurred and continued to occur; (5) as a result of the Safety and Labor Misconduct, the Company has been subjected to numerous lawsuits by families and former employees as well as state regulatory action; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

24.     In further breach of their fiduciary duties, Defendants Thompson, Amandi, and Wyatt engaged in lucrative insider trading while the Company's common stock was trading at artificially inflated prices as a result of the Individual Defendants causing the Company to issue materially false and misleading statements, reaping aggregate personal profits of approximately *$526,494*.

25.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

26.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chairman of the Board, its former CEO, its

Chief Financial Officer ("CFO"), its Board of Directors, and various underwriters to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Oregon, Portland Division (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

28.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO and Chairman of the Board's, the CFO's, and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

Page 10 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

30.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Oregon or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

33.    Venue is proper in this District pursuant 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Company is headquartered in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

34.    Plaintiff is a current shareholder of KinderCare. Plaintiff has continuously held KinderCare common stock at all relevant times.

### Nominal Defendant KinderCare

35.    Nominal Defendant KinderCare is a Delaware corporation headquartered at 5005 Meadows Road, Lake Oswego, Oregon 97035. KinderCare stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KLC."

### Defendant Thompson

36.    Defendant Thompson served as the Company's CEO from June 2024 to December 2, 2025, and as a Company director from June 5, 2025 to December 2, 2025.

Page 11 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Defendant Thompson remained with the Company as a non-executive officer employee until December 31, 2025. Previously, Defendant Thompson served as the Company's President from 2021 to 2024 and as the Company's CFO from 2015 to 2019.

37.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Thompson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 3, 2024 | 1,681 | $22.46 | $37,755 |
| February 23, 2025 | 1,308 | $19.70 | $25,768 |
| May 19, 2025 | 7,355 | $12.29 | $90,393 |
| May 28, 2025 | 1,208 | $11.73 | $14,170 |
| August 26, 2025 | 1,208 | $7.31 | $8,830 |

Thus, in total, before the fraud was exposed, Defendant Thompson sold 12,760 shares of Company common stock on inside information, for which he received approximately $176,916 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the schemes.

38.    The Schedule 14A the Company filed with the SEC on April 21, 2025 (the "2025 Proxy Statement") stated the following about Defendant Thompson:

> **Paul Thompson** has served as our Chief Executive Officer since June 2024. Prior to that, Mr. Thompson served as our President from 2021 to 2024 and as our Chief Financial Officer from 2015 to 2019. Prior to joining the Company, Mr. Thompson worked at Safeway Inc., a retail company, from 2005 to 2015, where he served most recently as a Senior Vice President of Finance. Mr. Thompson holds a B.A. from Gustavus Adolphus College and is a Certified Public Accountant in the state of Minnesota (currently inactive). Mr. Thompson has been nominated to serve on our Board because of his extensive industry and institutional knowledge, operational experience, and continuity that he brings to our Board as our current Chief Executive Officer.

(Emphasis in original).

Page 12 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

**Defendant Amandi**

39.    Defendant Amandi has served as the Company's CFO since 2019. Previously, Defendant Amandi served as the Company's Senior Vice President of Planning & Analysis from 2015 to 2019 and as the Company's Corporate Controller from 2011 to 2015.

40.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Amandi made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| December 3, 2024 | 753 | $22.46 | $16,912 |
| February 23, 2025 | 611 | $19.70 | $12,037 |
| May 19, 2025 | 3,087 | $12.29 | $37,939 |
| May 28, 2025 | 517 | $11.73 | $6,064 |
| August 26, 2025 | 517 | $7.31 | $3,779 |

Thus, in total, before the fraud was exposed, Defendant Amandi sold 5,485 shares of Company common stock on inside information, for which he received approximately $76,732 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the schemes.

41.    The 2025 Proxy Statement stated the following about Defendant Amandi:

**Tony Amandi** has served as our Chief Financial Officer since 2019. Mr. Amandi previously served as our Senior Vice President of Financial Planning & Analysis from 2015 to 2019, and Corporate Controller from 2011 to 2015. Prior to joining the Company, Mr. Amandi worked at PricewaterhouseCoopers LLP in their audit and assurance practice. From 2013 to 2018, Mr. Amandi served on the board of directors of Schoolhouse Supplies Inc., a nonprofit education company. Since 2020, Mr. Amandi has also served on the Dean's Council of Excellence at the Oregon State University College of Business. Mr. Amandi holds a B.S. from Oregon State University and a Masters in Accounting from the Marshall School

Page 13 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

of Business at the University of Southern California. Mr. Amandi is a Certified Public Accountant in the State of Oregon and is a Certified Treasury Professional.

(Emphasis in original).

### Defendant Wyatt

42.     Defendant Wyatt has served as the Company's CEO since December 2, 2025. Defendant Wyatt has also served as a Company director since 2012, and as the Chairman of the Board since September 2021. Previously, Defendant Wyatt served as the Company's CEO from 2012 to 2024.

43.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Wyatt made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 3, 2024 | 2,479 | $22.46 | $55,678 |
| February 23, 2025 | 1,992 | $19.70 | $39,242 |
| March 24, 2025 | 1,893 | $13.85 | $26,218 |
| May 19, 2025 | 8,909 | $12.29 | $109,492 |
| May 28, 2025 | 2,112 | $11.73 | $24,774 |
| August 26, 2025 | 2,386 | $7.31 | $17,442 |

Thus, in total, before the fraud was exposed, Defendant Wyatt sold 19,771 shares of Company common stock on inside information, for which he received approximately $272,846 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the schemes.

44.     The 2025 Proxy Statement stated the following about Defendant Wyatt:

**John T. Wyatt** has served on our Board since 2012 and has served as Chairman of our board of directors since September 2021. Mr. Wyatt also served as our Chief Executive Officer from 2012 to 2024. Prior to joining the Company, Mr.

Page 14 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Wyatt held leadership roles at several consumer-oriented brands, such as Old Navy and Cutter & Buck. Since 2019, Mr. Wyatt has served on the board of directors of Vishal Mega Mart Private Limited, a retail company in India, and from 2010 to 2020, he served on the board of directors of Jack in the Box Inc., a quick service restaurant company. We believe Mr. Wyatt is qualified to serve on our board of directors because of his extensive industry and institutional knowledge, operational experience, and continuity that he brings to our board of directors as our former Chief Executive Officer.

(Emphasis in original).

**Defendant Desravines**

45.     Defendant Desravines is the Lead Independent Director of the Board and has served as a Company director since 2021. Defendant Desravines currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

46.     The 2025 Proxy Statement stated the following about Defendant Desravines:

**Jean Desravines** has served on our Board since 2021. Mr. Desravines is the Chief Executive Officer at New Leaders, a national education nonprofit organization, where he has been employed since 2006 and chief executive officer since 2011. In his role as Chief Executive Officer at New Leaders, he manages an organization that develops leaders for high-need schools in more than 20 cities and 15 states. Mr. Desravines previously served in senior positions in the New York City Department of Education, including as senior counselor to the chancellor of New York City's public school system. Since 2018, Mr. Desravines has served on the board of directors of Houghton Mifflin Harcourt Company, a publishing company. In this role, he has served on the audit and compensation committees since 2018 and 2019, respectively. He has also served on the board of trustees of the Moriah Fund, a private foundation dedicated to promoting human rights and social justice, since 2022, and as a director of America Achieves, a national non-profit organization dedicated to workforce development in the United States, since 2015. Mr. Desravines holds a B.A. from St. Francis College and a M.P.A. from New York University. We believe that Mr. Desravines is qualified to serve on our board of directors given his breadth of leadership experience in the education industry as well as his expertise in educational policies and organizational matters.

(Emphasis in original).

4282152

**Defendant Deputy**

47.    Defendant Deputy has served as a Company director since 2021. Defendant Deputy currently serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

48.    The 2025 Proxy Statement stated the following about Defendant Deputy:

**Christine Deputy** has served on our Board since 2021. Ms. Deputy is the Chief People Officer at Expedia Group, a travel technology company. Prior to joining Expedia Group, Ms. Deputy served as Chief People Officer or Chief Human Resources Officer at various companies including Pinterest, Inc., Nordstrom, Inc., and Dunkin' Brands. Ms. Deputy also previously served as Group Human Resources Director at Aviva plc and was the Human Resources Director at Global Retail Banking for Barclays Bank.  Ms. Deputy also held various senior roles at Starbucks Corporation, including Vice President, Human Resources Asia Pacific. Ms. Deputy holds a B.A. from George Washington University. We believe that Ms. Deputy is qualified to serve on our board of directors due to her broad global experience in human capital management, business strategy, high growth and mission-driven companies.

(Emphasis in original).

**Defendant Nuzzo**

49.    Defendant Nuzzo has served as a Company director since 2021. Defendant Nuzzo currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

50.    The 2025 Proxy Statement stated the following about Defendant Nuzzo:

**Michael Nuzzo** has served on our Board since 2021. Since October 2022, Mr. Nuzzo has served as Chief Executive Officer of Eyemart Express, a national eyewear retailer and division of VSP Vision Care. From 2019 to August 2022, Mr. Nuzzo served as Executive Vice President, Chief Operating Officer and President of Petco Services at Petco Health & Wellness Company, Inc. ("Petco, Inc."). From 2015 to 2021, Mr. Nuzzo served as Executive Vice President, Chief Financial Officer at Petco, Inc. and played a key role in the company's initial public offering in January 2021. Prior to joining Petco, Inc., Mr. Nuzzo served as the Chief Administrative Officer at 4moms, a technology and robotics startup company, from 2014 to 2015. Prior to joining 4moms, Mr. Nuzzo served as the Executive Vice President and Chief Financial Officer for GNC Holdings, Inc., a

Page 16 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

multinational health and nutrition retailer, from 2008 to 2014, playing a lead role in the company's initial public offering in 2011. From 1999 to 2008, Mr. Nuzzo served in various senior level finance, retail operations and strategic planning roles with Abercrombie & Fitch Co., a specialty retailer of casual clothing, including Senior Vice President of Corporate Finance from June 2008 to September 2008. Mr. Nuzzo holds a B.A. from Kenyon College and an M.B.A. from the University of Chicago. We believe that Mr. Nuzzo is qualified to serve on our board of directors due to his experience in the areas of finance, marketing, general management and corporate governance.

(Emphasis in original).

### Defendant Russell

51.    Defendant Russell served as a Company director from 2018 until June 5, 2025.

52.    The Offering Documents stated the following about Defendant Russell:

*Benjamin Russell* has served on our board of directors since 2018. Mr. Russell is a Senior Vice President at Partners Group, where he has been employed since 2017. Prior to joining Partners Group, Mr. Russell served as Vice President for MBHE Holdings LLC, an investment company, from 2009 to 2017. Mr. Russell holds a B.A. from Middlebury College and an M.B.A. from the Tuck School of Business. We believe Mr. Russell is qualified to serve on our board of directors given his experience working alongside management of other portfolio companies and his financial experience.

(Emphasis in original).

### Defendant Schwartz

53.    Defendant Schwartz has served as a Company director since 2015, and currently

serves as a member of the Compensation Committee.

54.    The 2025 Proxy Statement stated the following about Defendant Schwartz:

**Joel Schwartz** has served on our Board since 2015. Mr. Schwartz is a Partner at Partners Group, where he has been employed since 2013. Mr. Schwartz is a leader of the Private Equity Services business unit for Partners Group and Co-Chairman of the Private Equity Direct Services Vertical Investment Committee. Prior to joining Partners Group, Mr. Schwartz served as Managing Director for Goldman Sachs and Angelo, Gordon & Co. and as a Partner at Apax Partners. Mr. Schwartz has served on the board of directors of Premistar, a HVAC maintenance and repair company since, 2021; BluSky Restoration, a restoration and remediation company since 2021; and Foundation Risk Partners, an insurance brokerage

company, since 2022. Mr. Schwartz previously served on the board of directors of United States Infrastructure Corp, a utility services company, from 2017 to 2024, Multiplan Inc., a healthcare technology company, from 2014 to 2016, and Varsity Brands Inc., an apparel company, from 2014 to 2018. Mr. Schwartz holds a B.S. and B.A.S from the University of Pennsylvania and an M.B.A. from Harvard Business School. We believe Mr. Schwartz is qualified to serve on our board of directors due to his extensive board experience advising other services-oriented portfolio companies and his business acumen.

(Emphasis in original).

### Defendant Waxenberg

55.    Defendant Waxenberg has served as a Company director since 2021, and currently serves as a member of the Audit Committee.

56.    The 2025 Proxy Statement stated the following about Defendant Waxenberg:

**Alyssa Waxenberg** has served our board since 2021. Ms. Waxenberg is the Senior Director of Patient Digital Products & Experience at Quest Diagnostics, a clinical diagnostics services company, where she has been employed since 2021. From 2018 to 2020, Ms. Waxenberg served as the Chief Digital Officer at Independent Pet Partners, a digital, retail, education and services company for pet wellness and from 2017 to 2018, she served as a Director for Watson Marketing at IBM, a technology and data security company. From 2004 to 2016, Ms. Waxenberg held various senior digital roles including the Vice President of the Mobile and Consumer Experience at Starwood Hotels & Resort, a global hospitality company. Ms. Waxenberg holds a B.B.A. from the University of Massachusetts and an M.B.A. from the University of Michigan. We believe that Ms. Waxenberg is qualified to serve on our board of directors given her extensive experience in digital e-commerce development, business operations, consumer marketing and strategic growth across a wide range of industries.

(Emphasis in original).

### Defendant Grasty

57.    Defendant Grasty served as a Company director from 2024 to June 5, 2025.

58.    The 2025 Proxy Statement stated the following about Defendant Grasty:

**Preston Grasty** has served on our Board since 2024. Mr. Grasty is a Senior Investment Leader at Partners Group, where he has been employed since 2018. Prior to joining Partners Group, Mr. Grasty served as an investment professional at Carnelian Energy Capital from 2015 to 2016 and as an investment banker at

Page 18 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Credit Suisse from 2014 to 2015. Mr. Grasty holds a B.B.A. and a Masters in Professional Accounting from the University of Texas McCombs School of Business and a M.B.A. from The University of Chicago Booth School of Business. We believe Mr. Grasty is qualified to serve on our board of directors given his experience working alongside management of other portfolio companies and his financial experience.

(Emphasis in original).

### Relevant Non-Parties

59.     The Consolidated Amended Complaint in the Securities Class Action captioned *In re KinderCare Learning Companies, Inc. Securities Litigation*, Case No. 3:25-cv-01424-AR, in the United States District Court for the District of Oregon incorporates statements from former employees of KinderCare who offered their experiences. The following are the former employees whose statements are referenced throughout this complaint before this court.

*FE-1*

60.     FE-1[3] previously served the Company for a total of roughly 28 years in various roles, notably as a former Senior District Leader in New Center Growth from mid-2022 through November 2023. In this capacity, FE-1 oversaw Company facilities, managed profit & loss, talent, and health & safety requirements, and supervised the hiring and retention operations of various Company schools. As such, FE-1 was responsible for between 15 and 18 Company centers nationwide. FE-1 reported to Anissa Walker, the Company's current Regional Vice President, who in turn reported to Michael Canavin ("Canavin"), President of KCLC. Canavin reported to Defendant Thompson and later Defendant Wyatt. Prior to her role in New Center Growth, FE-1 served as a Senior Manager for the Company's Center Operations from 2018 through 2022. In that capacity, FE-1 transmitted Company initiatives between the Company's

---

[3] Former KinderCare employees are herein referred to as "FE-#" and are all referenced using feminine pronouns to maintain their confidentiality.

Page 19 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

corporate offices and its centers. In her role as a Senior Manager, FE-1 reported to then-Vice President Center Operations Sarah Redgrave, and later to Melissa Bauer, who currently serves the Company as a Senior Financial Analyst.

### FE-2

61.     FE-2 served the Company in various roles from October 2016 through July 2025. After first serving as a District Manager for the Company, FE-2 was elevated to the role of Client Relations Business Parter – Nationwide. Later on, FE-2 was promoted to the role of Client Success Manager – Nationwide, a position she held from October 2023 through the end of her employment with the Company in July 2025. In her capacity as a Client Success Manager, FE-2 served as a liaison between District Leaders and the Company's clients. As such, FE-2's division sourced childcare facilities for its various customers, including municipalities, universities, and corporations. Moreover, FE-2's responsibilities included contract negotiation for both new and existing clients. FE-2 reported to Jeffery Talkington, who currently serves the Company as a Manager, Client Implementation and Adoption. Jeffery Talkington reported to Amy Harmon, a former Vice President, Client Success and Senior Director, Implementation for the Company, who likewise reported to Joshua Noda, who currently serves the Company as the Vice President, Operations.

### FE-3

62.     FE-3 previously served the Company as a facility director from June 2021 through December 2024 in the Virginia and Washington, D.C. metro area. In this capacity, FE-3 controlled the operations of her facilities which included the following roles: (1) enrolling students; (2) hiring and managing staff; (3) managing the facility budget; and (4) recording key performance indicators ("KPIs"). Moreover, FE-3 was directed at times by the Company to

Page 20 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

manage roughly a dozen further facilities in her area which the Company deemed to be in crisis. FE-3, as with other facility directors, reported to Company District Leaders, who likewise reported to their Regional Vice President. The Company's Regional Vice Presidents in turn reported to the Company's president, who was Defendant Thompson until May 2024.

### FE-4

63.     FE-4 previously served the Company as a center director at a Company facility in Texas from approximately January 2022 through August 2025. FE-4 reported to several District Leaders throughout her time with the Company, with the last District Leader being Jacian Lewis. Jacian Lewis has since been elevated to the position of Regional Manager in the Company.

### FE-5

64.     FE-5 previously served the Company as a facility director in the Northeast region from Fall 2023 through Spring 2025. In this capacity, FE-5 managed the day-to-day operations of the facility, including such tasks as: (1) working with human resources on matters of hiring, training and compliance; (2) hiring and training staff; and (3) enforcing compliance with applicable regulations. FE-5 reported to her District Leader, who likewise reported to the Area Vice President. In turn, the Area Vice President reported to Canavin.

### FE-6

65.     FE-6 previously served the Company as a Regional Director of School Partnerships – Midwest from August 2022 through November 2024. FE-6 primarily served in a sales capacity for the Company's Champions business. FE-6 reported to Greg Gray, a former National Director of Sales and Business Development for the Company. In addition, prior to and after Greg Gray's tenure with the Company, FE-6 reported to Rob Magliano a former Vice

Page 21 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

President of Sales for the Company. In turn, Rob Magliano reported to Dan Figurskim, who currently serves the Company as the President of Education / Champions.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66. By reason of their positions as officers, directors, and/or fiduciaries of KinderCare and because of their ability to control the business and corporate affairs of KinderCare, the Individual Defendants owed KinderCare and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage KinderCare in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of KinderCare and its shareholders so as to benefit all shareholders equally.

67. Each director and officer of the Company owes to KinderCare and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68. The Individual Defendants, because of their positions of control and authority as officers and directors of KinderCare, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69. To discharge their duties, the officers and directors of KinderCare were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

Page 22 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of KinderCare, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants, who collectively comprised a majority of KinderCare's Board at all relevant times.

71.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

72.    To discharge their duties, the officers, and directors of KinderCare were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of KinderCare were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Oregon, and the United States, and pursuant to KinderCare's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how KinderCare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of KinderCare and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that KinderCare's operations would comply with all applicable laws and KinderCare's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

Page 24 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to KinderCare and the shareholders the duty of loyalty, requiring that each favor KinderCare's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and KinderCare and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with KinderCare, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by KinderCare.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act, and violations of the Securities Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

79. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of KinderCare was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

Page 26 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

81.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of KinderCare and was at all times acting within the course and scope of such agency.

## KINDERCARE'S CODE OF CONDUCT

82.    The Company's Code of Conduct states that its purpose is to:

- promote ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

- promote full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

- promote compliance with applicable governmental laws, rules, and regulations;

- promote the protection of Company assets, including corporate opportunities and confidential information;

- promote fair dealing practices;

- deter wrongdoing; and

- ensure accountability for adherence to the Code.

83.    The Code of Conduct further states that "[a]ll directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations as described below in Section X, Reporting and Investigation of Violations."

84.    Under the heading, "Ethical Conduct" the Code of Conduct states the following:

The Company policy is to promote high standards of integrity by conducting its affairs ethically.

Each director, officer, and employee must act with integrity and observe the highest ethical standards of business conduct in their dealings with the Company' customers, suppliers, partners, service providers, competitors, employees, and anyone else with whom they have contact in the course of performing their job.

85.     Under the heading, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

A conflict of interest occurs when an individual's private interest (or the interest of a member of their family) interferes, or even appears to interfere, with the interests of the Company as a whole.  A conflict of interest can arise when a director, officer, or employee (or a member of their family) takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively.  Conflicts of interest also arise when a director, officer, or employee (or a member of their family) receives improper personal benefits as a result of their position in the Company. Any activities or situations that have the appearance of a conflict of interest with the Company must be avoided. This includes activities that compete with the Company or interfere with the proper performance of an individual's duties or responsibilities to the Company.

86.     Under the heading, "Disclosure," the Code of Conduct states the following:

Directors, officers, and employees who contribute in any way to the preparation or verification of the Company's periodic reports, financial statements, and other financial information made available to the Company's lenders and investors, must ensure that the Company's books, records, and accounts are accurately maintained. Each director, officer, and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.  Each director, officer, and employee who is involved in the Company's disclosure process must:

- be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

- take all necessary steps to ensure that all materials and filings with the Company's lenders and investors, and all public communications about the financial and business condition of the Company, provide full, fair, accurate, timely, and understandable disclosure.

87.     Under the heading, "Compliance," the Code of Conduct states the following:

Directors, officers, and employees should comply, both in letter and spirit, with all applicable laws, rules, and regulations in the jurisdictions in which the Company operates.

Although not all directors, officers, and employees are expected to know the details of all applicable laws, rules, and regulations, it is important to know enough to determine when to seek advice from appropriate personnel.  Questions about compliance should be submitted to the Company's Vice President of Legal & Risk.

Page 28 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

No director, officer, or employee may purchase or sell any Company securities while in possession of material nonpublic information regarding the Company, nor may any director, officer, or employee purchase or sell another company's securities while in possession of material nonpublic information regarding that company. It is against Company policies and illegal for any director, officer, or employee to use material nonpublic information regarding the Company or any other company to:

- obtain profit for themself; or

- directly or indirectly "tip" others who might make an investment decision based on that information.

88.    Under the heading, "Fair Dealing," the Code of Conduct states the following:

Don't use or share nonpublic information to buy or sell stock

Each director, officer and employee must deal fairly with the Company's customers, suppliers, partners, service providers, competitors, employees, and anyone else with whom they have contact in the course of performing their job. No director, officer, or employee may take unfair advantage of anyone through manipulation, concealment, abuse, or privileged information, misrepresentation of facts or any other unfair dealing practice. In addition to these requirements, when dealing with such third parties, employees must also follow the KCE Code.

89.    Under the heading, "Reporting and Investigation of Violations," the Code of Conduct states the following, in relevant part:

Actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee.

Actions prohibited by this Code or other guidelines of the Company involving anyone other than a director or executive officer must be reported to the Company's Vice President of Legal & Risk.

\*\*\*

All directors, officers and employees are expected to cooperate in any internal investigation of misconduct, and anyone who fails to do so is subject to disciplinary action up to and including termination of employment or other service to the Company, in accordance with applicable law. All individuals are required to provide honest, truthful, and complete information in any investigation.

Page 29 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

90.    Under the heading, "Waivers," the Code of Conduct states the following:

Each of the Board of Directors (in the case of a violation by a director or executive officer) and the Vice President of Legal & Risk (in the case of a violation by any other person) may, in its discretion, waive any violation of this Code.

Any waiver for a director or an executive officer shall be disclosed as required by Securities and Exchange Commission and NYSE rules.

91.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Safety and Labor Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and violations of the Securities Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## KINDERCARE'S AUDIT COMMITTEE CHARTER

92.    The Company's Audit Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit Committee is to:

[A]ssist the Board in its fulfilling it's responsibilities relating to oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the independent auditor's qualifications and independence, the performance of the Company's internal audit function and independent auditor, and preparing the report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement, including the disclosure required by Item 407(d)(3)(i) of Regulation S-K.

93.    The Audit Committee Charter states its purpose further to include: "assisting the Board's oversight of: the integrity of the Company's financial statements; the Company's

Page 30 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

compliance with legal and regulatory requirements; the independent auditor's qualifications and independence; and the performance of the Company's internal audit function and independent auditor." Furthermore, it states that the purpose also includes "preparing the report of the Committee that the Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement."

94.    In a section titled "Duties and Responsibilities of the Committee," under the subsection "Annual Financial Statements and Annual Audit," the Audit Committee Charter states the following responsibilities of the Audit Committee:

> 3. *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.
>
> 4. *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> 5. *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

(Emphasis in original).

95.    In the same section, under the subsection "Quarterly Financial Statements," the Audit Committee Charter notes the following responsibility of the Audit Committee:

> 6. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(Emphasis in original).

96.    In the same section, under the subsection "Controls and Procedures," the Audit Committee Charter states the following responsibilities of the Audit Committee:

4282152

7. *Disclosure*. The Committee must review disclosures about any significant deficiencies or material weaknesses in the design or operation of internal controls and any fraud involving management or employees playing a significant role in the Company's internal controls, made to the Committee by the Company's chief executive officer and chief financial officer, including, to the extent applicable, any disclosures made during their certification process for Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q.

8. *Internal Controls and Internal Control Report*. The Committee shall review and discuss with management, any internal audit staff or other personnel responsible for any internal audit function and the independent auditor the adequacy of the Company's internal controls, any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies and, to the extent applicable, the Company's internal control report and the independent auditor's internal control report prior to the filing of any Annual Report on Form 10-K or any Quarterly Report on Form 10-Q required to be filed by the Company with the SEC.

(Emphasis in original).

97.     In the same section, under the subsection "Other Duties and Responsibilities," the Audit Committee Charter notes the following responsibilities of the Audit Committee, in relevant part:

9. *Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases (paying particular attention to the use and preparation of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

10. *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

11. *Internal Audit Matters*. To the extent necessary or appropriate, with respect to any internal audit function established by the Company, the Committee must (i) review the appointment and replacement of the senior internal auditing executive and discuss with the independent auditor and management the internal audit department responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit; (ii) receive periodic reports on the scope and results of work performed by the internal audit function; and (iii) review the significant reports to management prepared by the internal auditing department and management's responses.

12. *Complaint Procedures*. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding

Page 32 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

***

14. *Review of Code of Business Conduct and Ethics.* The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code.

(Emphasis in original).

98.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Safety and Labor Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of  the Exchange Act, and violations of the Securities Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

<b><u>INDIVIDUAL DEFENDANTS' MISCONDUCT</u></b>

<u>**Background**</u>

99.     KinderCare is an Oregon-based Delaware Corporation whose business operations surround the ECE industry. As such, the Company's services are directed towards children between the ages of 6 weeks and 12 years of age. The Company currently operates over 1,500 ECE centers capable of handling an aggregate of over 200,000 children.

Page 33 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

100. In addition, the Company maintains roughly 1,000 before- and after-school locations across 40 states and the District of Columbia as of December 28, 2024. Moreover, the Company utilizes a proprietary curriculum known as the "Early Foundations curriculum." The Early Foundations curriculum purports to encompass "all critical learning domains for young children including language and literacy, social and emotional development, cognitive development, executive function, physical/motor development and wellness, and creative arts."[4]

101. The Company's businesses are divided under the following brands: (1) KCLC; (2) Crème School; and (3) Champions. KCLC purports to be the largest private provider of ECE centers in the United States, and is the largest source of the Company's revenue. For instance, in 2023 Fiscal Year KCLC was responsible for 88.3% of the Company's revenue.

102. The Crème School serves as a provider of community-based ECE, specializing in servicing families with children between the ages of six weeks and twelve years of age. The Crème School comprises over forty schools in fifteen states. The Company's Champions business is a major provider of before- and after-school programs in the United States. As such, Champions provides supplemental education to families with pre-school aged children across roughly 1,000 locations as of December 28, 2024.

103. According to the Company, its greatest source of revenue creation is increasing weekly, full-time enrollment at Company facilities. The Company measures its enrollment rate through its FTE and its Occupancy Rate. The Company's Occupancy Rate refers to the "average weekly ECE same-center enrollment divided by the total of the ECE same-centers' capacity" in a given period. Thus, a decrease in the Company's FTE and Occupancy Rate corresponds with a decrease in the Company's revenue generation. The Occupancy Rate includes Company facilities

---

[4] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001873529/000095017025043210/klc-20241228.htm#item1.

Page 34 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

that have been operated by the Company for at least twelve months prior to the period end date and does not include facilities that have been closed.

104.    Notably, the Company internally recognized the impact that regulatory noncompliance would have on its FTE and Occupancy Rate. For instance, in the internal Company document titled "KinderCare: Teacher's First 100 Days Workbook," the Company noted a direct relationship between the occurrence of children being left unattended at Company facilities and a decrease in those facilities' enrollment.

#### Federal Subsidies and Regulations Affecting KinderCare

105.    The Company has noted that, prior to the IPO, over one-third of the Company's revenues derived from federal subsidies. In 2023, the Company received $796 million in subsidy revenue, or approximately 32% of the total $2.51 billion in revenue the Company received that same year. Moreover, in 2024 the Company received $942.1 million in subsidy-derived revenue, or approximately 35% of the total $2.66 billion in revenue the Company received that same year.

106.    The subsidies which the Company has received were pursuant to the CCDBGA. The CCDBGA's stated purpose is to provide funding to state agencies to cover the childcare expenses of eligible children. Notably, eligibility for subsidies under the CCDBGA requires state implementation of practices and procedures which are in compliance with child care licensing requirements.

107.    The CCDBGA's eligibility requirements include, *inter alia*, states to define and enforce staff-to-child ratio standards pertaining to: "(I) group size limits for specific age populations, as determined by the State; (II) the appropriate ratio between the number of children

Page 35 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

and the number of providers, in terms of the age of the children in child care, as determined by the State; and (III) required qualifications for such providers, as determined by the State."[5]

108.    Moreover, eligibility under the CCDBGA requires states to perform criminal background checks on all potential child care employees and to implement measures that restrict the employment of child care staff who do not meet the stated requirements of the CCDBGA. As such, the CCDBGA requires state compliance with child abuse reporting requirements. To this end, the CCDBGA notes that states must include a "certification that there are in effect within the State, under State or local law, requirements designed to protect the health and safety of children[.]"[6]

### KinderCare's IPO

109.    On or about July 9, 2015, the Switzerland-based investment management firm and private equity group Partners Group acquired the Company from the Oregon-based company Knowledge Universe. Partners Group acquired KinderCare for approximately $1.5 billion, notably using financing from several banks, including Barclays Capital, Inc.

110.    In November 2021, the Company attempted to conduct an IPO, but unexpectedly postponed the IPO due to undisclosed regulatory holdups. As such, in July 2023 the Company officially withdrew its prior intent to initiate an IPO.

111.    In September 2024, the Company reported its intent to restart its attempted IPO. On October 9, 2024, the Company conducted its IPO, selling a total of 27.6 million shares of Company common stock at $24 per share. Notably, this figure included the Company's underwriters' exercise of options to sell an additional 3.6 million shares of Company common stock. The IPO yielded net proceeds of over $600 million. Moreover, the Company's stock price

---

[5] 42 U.S.C. § 9858c(c)(2)(H)(i).

[6] 42 U.S.C. § 9858c(c)(2)(I).

Page 36 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

climbed over 9% on its first official day of trading, and immediately following the IPO the Company was valued at approximately $2.8 billion.

112.    Notably, the Offering Documents explained that the proceeds from the IPO would "repay $527.2 million of loans outstanding [under the Company's existing indebtedness]" and "pay $7.3 million of other expenses." A substantial portion of the Company's debt derived from payments to Partners Group, as in March 2024 the Company completed a $320 million distribution to its then-parent holding company controlled by Partners Group. The March 2024 distribution by the Company was financed, in part, by a $265 million incremental term loan.

113.    Moreover, the Offering Documents noted that following the IPO, Partners Group would remain KinderCare's controlling shareholder, with 69% ownership interest in the Company.

114.    In anticipation of the IPO, the Individual Defendants conducted a roadshow, a key method by which the Company, its executives, and lead underwriters communicate directly with institutional investors (the "IPO Roadshow"). The IPO Roadshow included a written presentation which emphasized the Company's "centralized operations," its strong performance across "Key Metrics" "since 2021," and its "strategic investments in technology and talent which "supported same-center occupancy."

115.    In addition, the IPO Roadshow touted the Company's "tangible advantages" over its competitors including its "safety and compliance best practices," "better talent attraction and retention," "brand recognition," and "investment in facilities." The IPO Roadshow further asserted that the Company's "relentless focus on driving high employee and family engagement leads to higher occupancy."

116. Also in connection with the IPO, Defendant Thompson made a public appearance on CNBC. During his CNBC appearance, Defendant Thompson noted that the IPO was "perfect timing for us [because] [w]e have been growing as an organization for us to become public now and accelerate growth, getting into more centers, serving more families[.]" Likewise, Defendant Amandi represented the Company on the Schwab Network to discuss the IPO and the Company's workforce. During the interview, Defendant Amandi held the following exchange with the interviewer, in relevant part:

> **Interviewer**: And then another issue is labor and churn and turnover. How do you find that to be? Do you have any comparisons? Obviously 2020 was a tough time. You have so many employees that you care about at the same time, sometimes there's churn. How are you doing in that?
>
> **Defendant Amandi**: *We're really stable*. I mean, I think it's a great thing because it's so important to us to have high quality teachers, especially lead teachers in the classroom. We focus a lot on engagement and we work with Gallup a lot to focus on that and make sure that we're providing great experiences for our teachers because *we've learned you get high quality teachers, you provide them great experiences, they stay, and they provide great quality care for children. And that's really what we're trying to do in the end*.

### KinderCare Hired and Retained Unqualified Staff Members

117. Despite asserting a commitment to attracting and maintaining high quality employees, the Company's practices reflected the opposite mentality. In reality, the Company consistently de-emphasized its labor requirements as well as the Company's overall compliance with regulatory requirements pertaining to staff-to-child ratios and employee background qualifications.

118. For instance, FE-2, who functioned as a liaison between the Company's District Leaders and the Company's clients, reported that the Company had long-standing issues pertaining to hiring and retaining qualified staff members. FE-2 further stated that the Company's rates of compensation were inadequate as compared to industry competitors. FE-2

Page 38 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

supported this assertion by noting that he sat on the childcare advocacy group Minnesota Child Care Association, noting that she learned what the Company's competitors paid their own staff.

119.    In addition, FE-1 explained that the Company subjected labor costs to high scrutiny and focused on restricting costs when possible. FE-1 further stated that one manner in which the Company cut labor costs was to inadequately compensate teachers and other staff members. As such, FE-1 noted that the Company's teacher and staff compensation fell below the market rate for such services.

120.    Moreover, FE-1 reported that one of the Company's major strategies prior to the IPO was to acquire existing facilities and then cut labor costs for such locations. Notably FE-1 stated that the Company would not invest in labor at such facilities, instead opting to reduce the hours of existing staff members and maintaining below market pay rates.

121.    FE-1 also provided an example of the Company's inadequate compensation rates through the Indianapolis market between 2021-2023. FE-1 stated that the market rate for teachers at that time and location was $15 per hour. However, the Company capped the rate for teachers at $14.25 per hour, substantially below the market rate. As such, FE-1 stated that little to no effort was made to hire or retain high-quality teachers.

122.    FE-1 further noted that the Company's inadequate compensation has resulted in the loss of high-quality teachers and considerable staff "churn." FE-1 described a cascading effect, whereby staff shortages forced facility directors and assistant directors to cover shortfalls and thus neglect their other responsibilities. As a result of these hiring difficulties, FE-1 explained that enrollment figures were negatively impacted, citing an example of a Company facility in Indianapolis, Indiana.

4282152

123.    FE-1 also explained that directors for the Company's facilities are provided with labor targets for the upcoming week's schedule, and added that facility directors are prohibited from scheduling more employees than the set labor target. These labor targets were set by a labor team within the Finance department using a tool known as "Anaplan."

124.    FE-3 reported that the Company paid its staff members the equivalent of minimum wage but expected performance above and beyond the rates paid. FE-3 noted that tension was further exacerbated by the Company's push for increased enrollment in the absence of additional resources. As such, FE-3 described the Company's employee compensation as a "*systemic problem*."

125.    FE-3 also reported that a lead teacher at the Company made between $9 and $13 per hour, which was unsustainable in the context of their job responsibilities and tenure at KinderCare. Moreover, FE-3 stated that employees merely received nominal raises, such as 5 cents per hour in Virginia. FE-3 reported that all concerns pertaining to pay issues were "stifled," and that the Company experienced hiring difficulties in Virginia and Maryland. Nevertheless, according to FE-3 the Company continued to drive facility directors to achieve 80% occupancy rates. FE-3 remarked that this proposition was unachievable as Company facilities could not "expect qualified teachers to fall out of the sky[.]" In addition, FE-3 noted that facility director vacancies resulted in the disenrollment of students from Company facilities.

126.    Given the above, the Company's business model was unsustainable. Likewise, FE-4 reported that the Company did not make offerings of value to hire and retain high-quality staff. Rather, FE-4 stated that the pay rate for teachers of roughly $13 per hour, despite their level of training, created a nearly impossible environment to hire and retain staff. FE-4

represented that facility directors were repeatedly told to "bring in more FTEs" in response to complaints pertaining to budgets and employee compensation.

### Widespread Violations of State Health and Safety Regulations at KinderCare Facilities

127. A substantial number of the Company's facilities across the United States were documented to have violated state regulations pertaining to health and safety. Moreover, these violations threatened both the safety and well-being of the children enrolled at KinderCare facilities as well as the overall financial prospects of the Company.

128. As noted above, the Monitoring & Inspection Investigation provided a detailed inquiry into state databases pertaining to ECE facilities reports. The publication of Monitoring and Inspection Reports is among the requirements established by the CCDBGA. Notably, while states may have different formats for their respective Monitoring and Inspection Reports, per 42 U.S.C. § 9858c(c)(2)(D) each report must include, *inter alia*, "major substantiated complaints about failure to comply with [the Act] and State child care policies" and failures to comply with "requirements designed to protect the health and safety of children."

129. The Monitoring & Inspection Investigation uncovered that, in the nine-month period leading up to the IPO (January 1, 2024 to October 9, 2024), almost 2,000 health and safety violations were reported at 680 Company KCLC facilities throughout the United States. As such, these figures demonstrate health and safety violations at approximately 45% of the Company's KCLC facilities in the first nine months of 2024. Among these violations were: (1) physical abuse of minors by Company staff (127 incidents); (2) verbal/mental abuse of minors by Company staff (48 incidents); (3) noncompliance with staff-to-child ratios (243 incidents); (4) incidents of unattended children (217 incidents); (5) incidents of failure to hire, train, or screen

appropriately qualified staff (900 incidents); (6) incidents of medical attention required (45 incidents); and (7) other nontrivial health and safety incidents (402 incidents).

130. The violations of state health and safety regulations were not limited to or restrained by any geographic location. For instance, the Company's Western facilities comprise the states of Alaska, Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, and Washington. During the nine-month period leading up to the IPO, approximately 31% of the Company facilities in the West were documented to have violated state health and safety regulations. This figure was comprised of 405 substantiated health and safety violations across 101 different facilities in the region.

131. As shown by the below chart from the Consolidated Class Action Complaint, organizing the health and safety violations documented at Company facilities in the Western

### KinderCare Health & Safety Violations
Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — West

| Nature of Health & Safety Violation | Incidents |
|---|---|
| Staff Physical Abuse of Minor | 25 |
| Staff Verbal/Mental Abuse of Minor | 7 |
| Noncompliance with Staff-to-Child Ratios | 38 |
| Child Unattended | 40 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 134 |
| Medical Attention Required | 10 |
| Other Nontrivial Health and Safety Incidents | 151 |
| TOTAL | 405 |

region as discovered by the Monitoring & Inspection Investigation:

Page 42 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

132. The reports of health and safety violations at Company facilities in the West include a significant number of severe events. For instance, in the nine months leading up to the IPO, Oregon state regulators cited six different Company facilities with at least thirteen violations, comprising nearly one-third of the Company's Oregon locations. Five of the thirteen violations were referred to as "serious" and were substantiated as a "valid finding [that] [c]hildren are in imminent danger."

133. More specifically, in September 2024 Oregon state regulators cited a Company facility in Beaverton, Oregon for failure to report a "serious incident involving a child being left unsupervised in their classroom" to the child's parents or to state authorities. Notably, the citation stated that the facility director admitted the violations. Similarly, in August 2024 Oregon state regulators cited a Company facility in Portland, Oregon for "serious" violations on "multiple occasions" pertaining to improper staff-to-child ratio requirements as well as for failure to notify parents when a child hit their head and suffered lacerations inside their mouth.

134. Likewise, during the nine months leading up to the IPO, California state regulators cited sixteen different Company facilities with fourteen violations. These violations included eight substantiated "Type A" violations, which refer to situations that created an immediate or substantial threat to the physical health, mental health, or safety of the children.

135. On February 20, 2024, state regulators in Nevada reported a Company facility in which a staff member physically struck a child on the face and the buttocks.

136. Also, on March 13, 2024, state regulators in Washington filed reports on a Company facility in which a staff member inappropriately carried one child, resulting in recurring injury, and another staff member pushed a child off a cot, resulting in a head injury to the child.

137.     In addition, on April 25, 2024, Nevada state regulators reported another Company facility for numerous violations including but not limited to pulling the hair of children and failing to comply with minimum staff-to-child ratios.

138.     On April 30, 2024, California state regulators issued a report on a Company facility in Livermore, California, stating that contrary to the Company's self-report, a staff member had "allowed [the infant] to crawl into the cabinet," "purposely closed the door" and "out of irritation . . . lock[ed] the child inside."

139.     Moreover, on June 28, 2024, Arizona state regulators cited a Company facility for allowing children to remain unattended, and noted that one child was found "outside the front entrance doors."

140.     Notably, the health and safety violations described above resulted in material decreases in enrollment and operational viability. For instance, a Monitoring and Inspection Report filed by California state regulators on March 5, 2024 stated that the regulators had to "pause[] enrollment" due to noncompliance with California regulations.

141.     The Company's Northeastern facilities comprise the states of Connecticut, Massachusetts, New Hampshire, New Jersey, New York, and Pennsylvania. During the nine-month period leading up to the IPO, approximately 47% of the Company facilities in the Northeast were documented to have violated state health and safety regulations.

142.     As shown by the below chart from the Consolidated Class Action Complaint, organizing the health and safety violations documented at Company facilities in the Northeastern region as discovered by the Monitoring & Inspection Investigation:

Page 44 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

## KinderCare Health & Safety Violations
Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — Northeast

| Nature of Health & Safety Violation | Incidents |
| --- | --- |
| Staff Physical Abuse of Minor | 29 |
| Staff Verbal/Mental Abuse of Minor | 10 |
| Noncompliance with Staff-to-Child Ratios | 32 |
| Child Unattended | 41 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 137 |
| Medical Attention Required | 7 |
| Other Nontrivial Health and Safety Incidents | 58 |
| TOTAL | 314 |

143. As in the West, the reports of health and safety violations at Company facilities in the Northeast include a significant number of severe events.

144. In February 2024, state regulators in New Jersey reported a Company facility in which a staff member bit a child.

145. In April 2024, Connecticut state regulators reported a Company facility where one staff member pushed a child down and pulled another child's legs out from under them, which resulted in the child falling and hitting their head.

146. In addition, in May 2024, Pennsylvania state regulators reported a Company facility regarding separate instances in which staff members: (1) slapped a child while changing the child's diaper; (2) pulled a child from the sink causing the child to hit their face on the sink; (3) dragging that same child across the floor and by the arm; (4) grabbing a child's harm to the

Page 45 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

extent the child's face slammed against the floor; (5) grabbing a child by the ribs and slamming them against the diapering table; and (6) verbally abusing a child and grabbing them by the neck.

147.    Moreover, on July 12, 2024, state regulators in Massachusetts reported a Company facility in which a staff member dragged a three-year old child twenty feet across the floor.

148.    The Company's Midwestern facilities comprise the states of Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, Ohio, and Wisconsin. During the nine-month period leading up to the IPO, approximately 53% of the Company facilities in the Midwest were documented to have violated state health and safety regulations.

149.    As shown by the below chart from the Consolidated Class Action Complaint, organizing the health and safety violations documented at Company facilities in the Midwestern region as discovered by the Monitoring & Inspection Investigation:

### KinderCare Health & Safety Violations
Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — Midwest

| Nature of Health & Safety Violation | Incidents |
| --- | --- |
| Staff Physical Abuse of Minor | 33 |
| Staff Verbal/Mental Abuse of Minor | 9 |
| Noncompliance with Staff-to-Child Ratios | 82 |
| Child Unattended | 70 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 314 |
| Medical Attention Required | 11 |
| Other Nontrivial Health and Safety Incidents | 116 |
| **TOTAL** | **635** |

Page 46 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

150. Wisconsin state regulators reported over 100 violations of state health and safety rules from 2021 to January 10, 2024 within a single Company facility. These violations included unsanitary conditions, staff-to-child ratio violations, injuries to children by staff-members, and inadequate sleeping arrangements. Notably, as a result of these violations, Wisconsin revoked the Company facility's license in January 2024. Moreover, FE-6 reported that the Company withdrew from a potential partnership with a school district in Wisconsin as a result of the incidents referred above.

151. A similar incident occurred in May 2024, also in Wisconsin. At that time, an 11-month-old infant was taken to the hospital and tested positive for cocaine following signs of illness displayed at a Company facility in Oak Creek, Wisconsin. It was discovered after the fact that a staff member had improperly stored a backpack containing cocaine in the facility's infant room, which resulted in a police report and conviction of the staff member. As a result of the May 2024 incident and an additional more than two dozen separate health and safety violations, Wisconsin suspended and revoked the Company facility's license in October 2024.

152. Moreover, Wisconsin state regulators reported at least twelve additional health and safety violations at Company facilities. These violations included instances of staff members, *inter alia*, injuring children. On February 28, 2024, Wisconsin state regulators cited an incident in which a Company staff member used a broomstick to push a child off a table and roughly grabbed another child's face.

153. In addition, on April 2, 2024, Missouri state regulators confirmed numerous health and safety violations at a Company facility. Missouri state regulators substantiated that a staff member had admitted to sexually abusing a child under the age of 12 at the facility, and possessed child sex abuse material on his phone. Incredibly, the Company continued to employ

the abusive staff member, without the completion of required background screenings. Moreover, the Company allowed the abusive staff member to cover teachers' breaks and to have children sit on his lap, despite the complaints of numerous other staff members.

154. On or around October 9, 2024, Indiana state regulators sanctioned a Company facility regarding a staff member's abuse of a 3-year-old child which was filmed by another staff member. Notably, the recording staff member reported the violation to a Company supervisor but at no point did a Company employee report the abuse to the child's parents, the Department of Child Services, or the police for over nine months after the incident. As a result of the incident, the abusive staff member pled guilty to battery in April 2025, and the Company facility was placed on probation.

155. The Company's Southern facilities comprise the states of Alabama, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia, as well as the District of Columbia. During the nine-month period leading up to the IPO, approximately 45% of the Company facilities in the Midwest were documented to have violated state health and safety regulations.

156. As shown by the below chart from the Consolidated Class Action Complaint, organizing the health and safety violations documented at Company facilities in the Southern region as discovered by the Monitoring & Inspection Investigation:

Page 48 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

### KinderCare Health & Safety Violations
Documented Incidents (Jan. 1, 2024 – Oct. 9, 2024) — South

| Nature of Health & Safety Violation | Incidents |
| --- | --- |
| Staff Physical Abuse of Minor | 40 |
| Staff Verbal/Mental Abuse of Minor | 22 |
| Noncompliance with Staff-to-Child Ratios | 91 |
| Child Unattended | 66 |
| Failure to Hire, Train, or Screen Appropriately Qualified Staff | 315 |
| Medical Attention Required | 17 |
| Other Nontrivial Health and Safety Incidents | 77 |
| **TOTAL** | **628** |

157.    On January 30, 2024, state regulators in Maryland reported a Company facility for health and safety violations pertaining to an incident in which a staff member pinned and slammed children down in their chairs.

158.    On February 6, 2024, state regulators in Kentucky reported a Company facility for health and safety violations pertaining to an incident in which a staff member was observed to have yelled at a child, pushed the child onto the ground, and threw the child into a wall.

159.    Likewise, on March 13, 2024 state regulators in North Carolina reported a Company facility for health and safety violations in which a staff member struck a child with the back of her hand.

160.    On June 10, 2024, Maryland state regulators issued another report against the Company regarding an incident resulting in the fracturing of an infant's skull.

Page 49 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

161.    Additionally, in August 2024, another incident occurred in North Carolina in which a child attending a Company facility could not be located for approximately twenty minutes. Notably, the Company facility in question was not operating at the required staff-to-child ratio. The lost child was eventually discovered in the middle of a busy three-lane highway, by passing motorists. As noted above, the Company did not promptly inform the parents of the incident. As a result of the August 2024 incident, the North Carolina Department of Health and Human Services continued to investigate the Company facility in question.

162.    Moreover, in many of the instances noted above and below, the Company consistently failed to meet its mandatory reporting obligations pertaining to health and safety violations. With regard to the March 2024 Pennsylvania reports in particular, state authorities determined that the director of the Company facility in question had actually instructed a staff member to falsify an incident report in which a staff member injured a child.

### KinderCare Retaliated Against Employees Who Reported Health and Safety Violations at its Facilities

163.    In addition to facilitating numerous health and safety violations throughout its ECE locations, the Company consistently retaliated against employees who reported or took action to prevent such violations. As a result of these retaliations, the Company has been subjected to five separate lawsuits by former KinderCare employees alleging wrongful termination.

164.    For instance, in the case captioned *Gillis v. KinderCare Educ. LLC*, No. 2581CV02808 (Mass. Super. Ct., Middlesex Cnty.) (filed Nov. 10, 2025), a former Company employee alleged that they were wrongfully terminated after separating a violent child from other children at her facility. Moreover, in the case captioned *John v. KinderCare Learning Ctrs., LLP*, No. 524718/2024 (N.Y. Sup. Ct., Kings Cnty.) (filed Sept. 9, 2024), a former

Page 50 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Company employee alleged that the Company fabricated defamatory statements and filed a false police report against them after the former employee reported signs of sexual abuse in a two-year old child at a Company facility.

### Lawsuits Filed Against KinderCare Underline the Numerous Health and Safety Violations at its Facilities

165.    The substantial health and safety violations recorded at the Company's facilities are reinforced by the numerous lawsuits filed against the Company by students and their families. These lawsuits illustrate a consistent track record of sexual and physical abuse of children by staff members, physical injury of children through the negligent supervision of staff members, negligent hiring, negligent training, and negligent retention of staff members. As of February 6, 2026, fifteen lawsuits have been filed against the Company on the grounds noted immediately above.

166.    In one particularly egregious case, captioned *Herrera v. KinderCare Learning Ctrs., LLC*, No. CJ-2025-786 (Okla. Dist. Ct., Canadian Cnty.) (filed Aug. 28, 2025) (the "Herrera Complaint"), the plaintiff alleges that the Company's negligent supervision in March 2022 resulted in the sexual assault of a four-year old girl by another four-year old boy at a Company facility. The Herrera Complaint further asserted, through the use of internal Company training documents, that the Company was aware of widespread instances of children being left unattended at Company facilities. The Herrera case is still currently ongoing.

### Lawsuits and Regulatory Actions Against KinderCare Underline Its Inadequate Labor Practices

167.    The Company's inadequate hiring, retention, and other labor practices are further reinforced by the numerous lawsuits and regulatory actions against the Company. For instance, in October 2023, the Company agreed to pay over $540,000 in restitution and civil penalties to the Massachusetts Attorney General for violations of Massachusetts labor laws, notably

Page 51 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

including the failure to fully compensate employees. Moreover, the Massachusetts Attorney General attributed some of the Company's violations to its problems of understaffing.

168.    Moreover, the Company's inadequate labor practices pertaining to the hiring and retention of its employees has subjected it to four separate class action lawsuits. The class action lawsuits allege, *inter alia*, that the Company failed to fully compensate employees for all the time worked and failed to provide overtime payments.

### **Materially False and Misleading Statements**

#### *October 8, 2024 and October 9, 2024 Offering Documents*

169.    On October 8, 2024 and October 9, 2024, the Company filed its Offering Documents pursuant to the IPO. In the Registration Statement and Prospectus, Defendant Thompson authored a letter under the heading "Health & Safety" (the "Offering Letter").

170.    Defendant Thompson stated in the Offering Letter that "*[w]e hold sacred our responsibility to protect and nurture the children in our care. Our rigorous safety standards across all classrooms are reinforced by ongoing training and measurement tools*. We build health bodies and minds throughout nutritious meals, and our *dedicated resources support teacher and child mental health and emotional safety*."

171.    In addition, the Offering Documents contained sections pertaining to the Company's operating strategy known as the "Four Pillars." Regarding the "Health & Safety" portion of the Company's operating strategy, the Offering Documents stated that "[*w*]*e consistently adhere to strict procedures across all of our centers to provide a healthy, safe environment for our children* and our workforce and to deliver confidence and peace of mind to families." In a section titled "Health & Safety," the Offering Documents stated that "[*w*]*e employ*

Page 52 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

*robust practices that support the overall well being of the children we serve, as well as our employees and staff*."

172. In the same section, the Offering Documents stated that "[*w*]*e maintain rigorous health and safety standards within all our classrooms across our over 2,400 centers and sites*." Moreover, the Offering Documents stated that "[*c*]*enter directors regularly provide safety training to their teachers and staff to ensure our employees are updated on our latest protocols and adhere to our safety standards*."

173. In a section titled "Operations & Growth," under the subheading "Sustainability Considerations," the Offering Documents stated that "[*t*]*he health and safety of children and our employees continues to be a top priority*." Under the same subheading, the Offering Documents added the following, in relevant part:

> *We make investments in our curriculum and in how we operate our centers to promote safety as well as physical, mental and emotional health." Our teachers and center staff undergo extensive training on mental and emotional health and safety practices to provide a safe environment for children and confidence and peace of mind for parents*.

174. In the same section, under the subheading "Technology Platform," the Offering Documents noted that the Company utilizes its "proprietary center management platform, OneCMS . . . across our entire organization . . . [to] promote[] *uniformity across centers . . . [and] accelerate[] the rapid adoption of KinderCare policies and processes for new center additions*."

175. In the same section, under the subheading "Government Regulation," The Offering Documents also discussed the Compliance regulatory compliance pertaining to the health and safety of children and infants under the care of the Company, stating the following, in relevant part:

Page 53 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

**Government Regulation**

Various aspects of our operations are subject to federal, state and local laws, rules and regulations, any of which may change from time to time. Laws and regulations affecting our business may change, sometimes frequently and significantly, as a result of political, economic, social or other events. ***We do not expect the costs of <u>continuing to comply</u> with applicable laws and regulations to have a material effect on our business. Some of the federal, state or local laws and regulations that affect us include*** but are not limited to . . .

> • *licensing and child care specific regulations*; [and]

> • environmental, *health and safety laws and regulations*.

176.    In the same section, under the same subheading, the Offering Documents discussed the pertinent regulations with which the Company is "***continuing to comply***," stating the following:

**Licensing and Child Care Centers**

Laws, regulations and licensing and other requirements impacting education, child care and before- and after-school programs exist at the national, state and local levels, and such laws, regulations and licensing periodically change. ***In most jurisdictions where we operate, our child care centers are required by law to meet a variety of operational requirements, including minimum qualifications and background checks for our center personnel as well as teacher-to-child ratios and various employment, facility, and health, fire and safety regulations***.

177.    In the same section, under the subheading "Training and Development," the Offering Documents stated the following about the compliance of the Company's employees with applicable health and safety regulations:

> ***Our teachers and center staff participate in an onboarding program prior to conducting student-facing activities. The program ensures new employees are grounded in our protocols and culture, from safe interactions with children and understanding local licensing regulations*** to building relationships with families.

178.    The Offering Documents also provided several assertions pertaining to the Company's hiring and retention of employees. For instance, the Offering Documents described "***People & Engagement***" as one of the Company's "Four Pillars" and explained that the

Page 54 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Company's "***industry-first talent filter helps us hire the best teachers and center staff who will thrive in our classrooms***" and noted that the Company "utilize[s] a proprietary, data-driven approach ***attract, hire and develop exceptional talent***."

179.   In the section titled "People & Engagement," the Offering Documents stated the following with regard to employee retention:

> Employee retention in the childhood education space is paramount for fostering a nurturing and stable environment for both educators and children. ***We are dedicated to creating a supportive culture for our staff which is driven by our shared values, expansive training and development, and a comprehensive total rewards program including competitive benefits and pay***, as further outlined below.

180.   In the same section, under the subheading "Employee and Family Retention and Engagement," the Offering Documents stated the following with regard to its "[t]eacher and [c]enter/[s]ite [s]taff [c]ompensation [a]pproach," stating the following:

> ***Ensuring our employees receive competitive pay has long been at the forefront of our retention and engagement strategy, with a special focus on investing in our teachers as they are at the heart of what we do every day***. We believe we will drive better and more consistent experiences for families, as well as foster happier and more fulfilled employees ***by providing employees with competitive pay***. With the goal of making KinderCare the best place for teachers to learn and grow as career educators, ***we began investing in wages by providing standardized annual merit-related increases in wages in 2015. Since then, we have prioritized investments in center and site staff wages***, including making incremental improvements in wages for our lead teachers and differentiating merit-based increases in wages by performance, tenure and pay as compared to a standard level of merit-based increases. . .
>
> ***We continue to honor teacher tenure with significantly higher wage rates starting at their one-year service anniversary***.

181.   In the section titled "Our Business," under the subheading "Our Industry," the Offering Documents asserted that "***[w]e believe we are particularly well positioned to attract talent due to our ability to offer competitive pay, benefits and training, along with more job flexibility compared to other ECE providers***."

Page 55 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

182.    In the same section, under the subheading "Growth Strategies," the Offering Documents stated that "*[w]e also offer competitive compensation and benefits packages as well as periodic salary increases for our teachers and staff*."

183.    In the same section, under the subheading "Growth Strategies," in the subsection "Occupancy Improvement," the Offering Documents stated the following regarding the Company's occupancy rates:

> *[S]trong track record of improving occupancy rates across our portfolio*. In the past decade, we increased our average same-center occupancy from 58% in 2013 to 69% in 2023 (or 71% excluding the impact from the acquisition of Crème School) *through a combination of strategic investments in technology, talent and implementing best practices across our centers*. We leverage quintile analysis to group our centers for evaluation. Quintile analysis ranks our centers by EBITDA levels. Our 4th and 5th quintile centers *have an embedded growth potential within our portfolio supported by our demonstrated success at driving occupancy improvement*.

184.    In the same section, under the same subsection, the Offering Documents stated the following, in relevant part:

> Given our scale and operational expertise and resources, *we possess the ability to serve families supported by public subsidy funding and the agility to meet evolving family preferences toward flexible and accredited providers*. In 2023, 9.0% of our same-center revenue increase was driven by centers that were classified as same-centers as of both fiscal 2023 and fiscal 2022. *We believe we are well positioned to continue to increase same-center revenues through our multi-pronged strategy of occupancy improvement* and tuition rate increases.

185.    In the same section, under the subheading "Our Competitive Strengths," The Offering Documents stated the following, in relevant part:

> We believe the following are our core strengths that differentiate us from our competition:
>
> ***
>
> We believe our scale creates a sustainable competitive advantage, enabling us to (i) *identify best practices within our network and apply them across all of our centers and onsite programs, (ii) consistently invest in our curriculum to*

*produce tangible student outcomes, (iii) attract and retain high-quality talent with a broad benefits package and career development opportunities*, . . .

\*\*\*

*Strong workforce engagement drives robust operational performance. We utilize a holistic approach to attract, train, develop and retain a talented workforce, at scale, and drive workforce engagement*. Our approach fosters stronger connections with families and better center financial performance. *Our workforce culture is a fundamental driver of employee engagement as we strive to maintain a culture that is mission-driven, inclusive and values the input of each of our employees. We measure success of our workforce engagement by our ability to provide continuity of care*.

186.   In the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," under the subheading "Factors Affecting Results of Operations," the Offering Documents stated that "*[w]e focus on employee engagement by developing a motivated, talented workforce to build a nurturing environment for children and strong relationships with families*."

187.   In the same section, under the subheading "Factors Affecting Results of Operations," in the subsection "Occupancy improvement," the Offering Documents stated that

> We aim to improve occupancy rates across our portfolio. Historically, *we increased our average occupancy through a combination of strategic investments in technology and talent, as well as implementing best practices at our centers*. We invest significant resources into our technology infrastructure to support our center and site operations and interactions with families. An analysis of occupancy data from across our centers indicates growth potential within our business.

188.   In the same section, under the same subheading, the Offering Documents stated the following with regard to revenue growth, in relevant part:

> Our future revenue growth is in part dependent on us continuing to grow revenues across our portfolio of centers. . . . *We focus on employee engagement by developing a motivated, talented workforce to build a nurturing environment for children and strong relationships with families*. . . . We help families access public subsidies, where appropriate, to make attendance at our centers more affordable. *The differentiation of our offerings provides us an opportunity to attract new families and drive enrollment and occupancy growth at our centers*.

Page 57 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Although we expect these marketing activities will increase our cost of services, we expect it to positively impact our results of operations in the future. ***General economic conditions, shifts in workforce demographics, and local market competition are our largest challenges in terms of future revenue growth***.

189.    In addition, the Offering Documents contained materially false and misleading risk factors which described only potential risks that "could" or "may" impact the Company. More specifically, the risk factors discussed in the Offering Documents noted that: (1) the Company's degree of compliance with health and safety regulations "could" affect its business operations; (2) "adverse publicity" "could" affect demand for the Company's services; and (3) that the Company's inability to hire, train, and retain adequate teachers "may" negatively impact the Company's business operations. For instance, in a section titled "Risk Factor," the Offering Documents stated the following:

> ***General Risks – Compliance with existing and new laws and regulations could impact the way we conduct business***.
>
> Laws, regulations and licensing, and other requirements impacting education, child care and before- and after-school programs at the national, state and local levels periodically change, and the ultimate cost of compliance cannot be precisely estimated. Although these regulations and requirements vary greatly from jurisdiction to jurisdiction, government agencies and accreditation organizations generally review, among other things, the adequacy of buildings and equipment, minimum square footage, ***ratio of staff to children, educational qualifications and training of staff, record keeping, nutrition requirements, curriculum, employee screening, compliance with health and safety standards***, data privacy and security requirements, and program quality. ***Failure of a center, site or program to comply with applicable regulations and requirements could subject it to sanctions, which can include fines, corrective orders, being placed on probation, loss of accreditation or, in more serious cases, suspension or revocation of the license to operate, inability to open or acquire new centers, or ability to participate in federal, state and local subsidy programs, and could require significant expenditures to bring our centers, sites or programs into compliance or result in the closing of the center, site or program. Certain government agencies may publish or publicly report major and/or minor regulatory violations and we may suffer adverse publicity, which could result in loss of enrollment in a center, site, program or market***. In addition, there may be unforeseen changes in regulations and licensing requirements, such as changes in

the required ratio of child center staff personnel to enrolled children that could have an adverse impact on our operations.

190.    Likewise, the Offering Documents contained materially false and misleading risk factors pertaining to regulatory reports, stating that "[c]ertain government agencies *may* publish or publicly report major and/or minor regulatory violations," and that the Company "*may suffer adverse publicity*," which "*could* result in loss of enrollment in a center, site, program or market."

191.    Moreover, the Offering Documents noted in the section titled "Summary Risk Factors" as one of the Company's "[r]isks [r]elated to [its] [b]usiness" that damage to its reputation "*may prevent us from achieving our business objectives or that may adversely affect our business, financial condition and results of operations*." The Offering Documents continued to state the following, in relevant part:

> *Because our success depends substantially on the value of our brands and reputation as a provider of choice, adverse publicity could impact the demand for our services.*
>
> *Our reputation and brand are critical to our business. Adverse publicity concerning reported incidents or allegations of inappropriate, illegal or harmful acts to a child at any child care center or site, or through a third-party provider, whether or not directly related to or involving us, could result in decreased enrollment at our child care centers or sites, the termination of existing corporate relationships, our inability to attract new corporate relationships or increased insurance costs, all of which could adversely affect our operations*. Brand value and our reputation can be severely damaged even by isolated incidents, particularly if the incidents receive considerable negative publicity or result in substantial litigation. These incidents may arise from events that are beyond our ability to control, such as instances of abuse or actions taken (or not taken) by one or more center or site managers or teachers relating to the health, safety or welfare of children in our care. In addition, from time to time, clients and others make claims and take legal action against us. Whether or not claims have merit, they may adversely affect our reputation and the demand for our services. Such demand could also diminish significantly if any such incidents or other matters erode general confidence in us or our services, which would likely result in lower revenues and could materially and adversely affect our business, financial condition and results of operations. Any reputational damage

could have a material adverse effect on our brand value and our business, which, in turn, could have a material adverse effect on our business, financial condition and results of operations.

192. Also, in the section titled "Summary Risk Factors," the Offering Documents noted as one of the Company's "[r]isks [r]elated to [its] [b]usiness" that obstacles to the hiring and retention of adequate staff members "***may prevent us from achieving our business objectives or that may adversely affect our business, financial condition and results of operations***." The Offering Documents further stated the following, in relevant part:

> ***Our business depends largely on our ability to hire and retain qualified teachers and maintain strong employee engagement***.
>
> The provision of child care services is personnel-intensive. ***Our business depends on our ability to attract, train and retain the appropriate mix of qualified employees and on effectively implementing and maintaining strong employee engagement, cultivating an atmosphere of trust, and effectively communicating the value proposition of working for us***. The child care industry traditionally has experienced high turnover rates. In addition, ***state laws require our teachers and other staff members to meet certain educational and other minimum requirements, and we often require that teachers and staff at our centers and sites have additional qualifications***. We are also required by state laws to maintain certain prescribed minimum adult-to-child ratios. ***If we are unable to hire and retain qualified teachers at a center or site, we could be required to reduce enrollment or be prevented from accepting additional enrollment in order to comply with such mandated ratios. In certain markets, we may experience difficulty in attracting, hiring and retaining qualified teachers due to tight labor pools, health concerns and changes in the work environment***, which may require us to offer increased salaries, enhanced benefits and institute initiatives to maintain strong employee engagement that could result in increased costs.

193. The statements referenced and identified above in ¶¶ 169-192 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company engaged in the Safety and Labor Misconduct; (2) the Company's violations of state laws and regulations resulted in the substantial withdrawal of families from its

Page 60 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

facilities; (3) the withdrawal of families from Company facilities would negatively impact its enrollment figures; (4) as a result, the Offering Documents' risk statements were not merely speculative given that purported risks had already occurred and continued to occur; (5) as a result of the Safety and Labor Misconduct, the Company has been subjected to numerous lawsuits by families and former employees as well as state regulatory action; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### *April 21, 2025 Proxy Statement*

194.     On April 21, 2025, KinderCare filed the 2025 Proxy Statement with the SEC. Defendants Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty solicited the 2025 Proxy Statement which contained material misstatements and omissions.

195.     The 2025 Proxy Statement called for shareholders to shareholders to vote to, *inter alia*: (1) re-elect Defendant Deputy and elect Defendant Thompson to the Board to serve until the 2028 annual meeting of the stockholders; (2) ratify the appointment of PricewaterhouseCoopers LLP at the Company's independent registered public accounting firm for the fiscal year ended January 3, 2026; (3) approve, on advisory basis, the compensation of the Company's named executive officers; and (4) approve, on advisory basis, the frequency of the future advisory votes on compensation paid to the Company's named executive officers.

196.     Regarding the Company's "Board Oversight of Risk Management," the 2025 Proxy Statement stated the following:

> While the full Board has the ultimate oversight responsibility for the risk management process, its committees oversee risk in certain specified areas. In particular, our audit committee oversees management of enterprise risks, including data and cyber security, as well as financial risks, business conduct and ethics, and is also responsible for overseeing the review and approval of related party transactions. Our compensation committee oversees the management of

risks relating to our executive compensation plans and arrangements and the incentives created by the compensation awards it administers. Our nominating and corporate governance committee oversees risks associated with corporate governance. Pursuant to the Board's instruction, management regularly reports on applicable risks to the relevant committee or the full Board, as appropriate, with additional review or reporting on risks conducted as needed or as requested by the Board and its committees.

197.    Regarding the Company's Code of Conduct, the 2025 Proxy Statement stated the following:

> We have adopted a code of business conduct and ethics applicable to our directors, officers and employees (the "Code of Conduct"). The Code of Conduct is available on our website at https://investors.kindercare.com/. If we make any substantive amendments to the Code of Conduct or grant any waiver, including any implicit waiver, from a provision of the Code of Conduct affecting our directors or executive officers, we will disclose the nature of such amendment or waiver on that website or in a Current Report on Form 8-K.

198.    Regarding the Company's Audit Committee, the 2025 Proxy Statement stated the following:

> Pursuant to the audit committee charter, the audit committee is responsible for the oversight of our accounting, reporting and financial practices. The audit committee has the responsibility to select, appoint, engage, oversee, retain, evaluate and terminate our external auditors; pre-approve all audit and non-audit services to be provided, consistent with all applicable laws, to us by our external auditors; and establish the fees and other compensation to be paid to our external auditors. During 2024, the audit committee pre-approved all audit and permitted non-audit services provided by PwC.

199.    Defendants Thompson, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company engaged in the Safety and Labor Misconduct; (2) the Company's violations of state laws and regulations resulted in the substantial withdrawal of families from its facilities; (3) the withdrawal of families from Company facilities would negatively impact its enrollment figures; (4) as a result, the Offering Documents' risk statements were not merely speculative given that purported risks had already occurred and continued to

Page 62 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

occur; (5) as a result of the Safety and Labor Misconduct, the Company has been subjected to numerous lawsuits by families and former employees as well as state regulatory action; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

200.    The 2025 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

201.    As a result of Defendants Thompson, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty causing the 2025 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendant Deputy and elect Defendant Thompson to the Board to serve until the 2028 annual meeting of the stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP at the Company's independent registered public accounting firm for the fiscal year ended January 3, 2026; (3) approve, on advisory basis, the compensation of the Company's named executive officers; and (4) approve, on advisory basis, the frequency of the future advisory votes on compensation paid to the Company's named executive officers.

**The Truth Begins to Emerge**

*November 20, 2024 Press Release and Earnings Call*

202.    The truth began to emerge on November 20, 2024, after the market closed, when the Company hosted the Q3 FY 2024 Earnings Call. During the Q3 FY 2024 Earnings Call, it was disclosed that "same center enrollment growth" was "***relatively flat***." Notably, the Company declined to provide revenue guidance for the 2025 Fiscal Year on November 20, 2025.

203.    On this news, the price per share of the Company's stock fell $3.43, or approximately 15%, from a price per share of $22.80 at the close of trading on November 20, 2024 to close at $19.37 at the close of trading on November 21, 2024.

*March 20, 2025 Press Release and Earnings Call*

204.    On March 20, 2025, after the market closed, the Company hosted the Q4 FY 2024 Earnings Call. During the Q4 FY 2024 Earnings Call, the Individual Defendants provided 2025 guidance of $2.75-$2.85 billion in full year revenue for the 2025 Fiscal Year. The Individual Defendants also reported that the Company anticipated "occupancy to be relatively ***flat*** year-over-year."

205.    Also during the Q4 FY 2024 Earnings Call, an analyst asked Defendant Thompson the following question:

> [I]s there a reason why you're expecting it to only be flat? I ask from the perspective that it looks like you had really good momentum in like the lower quintiles in 2024. I'd expect that to continue in addition to various other initiatives. I think I would expect it to go higher.

206.    In response, Defendant Thompson stated that "the team is working hard on elevating our operational practices across those centers that have opportunity to further supercharge the enrollment within them," but that until those practices "specifically resonate," "we're keeping you in line with an occupancy that will remain relatively flat."

Page 64 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

207.    On this news, the price per share of the Company's stock fell $3.92, or approximately 22.2%, from a price per share of $17.68 at the close of trading on March 20, 2025 to close at $13.76 at the close of trading on March 21, 2025.

### *April 3, 2025 Bear Cave Report*

208.    On April 3, 2025, research analyst Edwin Dorsey issued the "Bear Cave Report. The Bear Cave Report noted the following in its summary:

> Today's investigation from The Bear Cave finds that ***KinderCare often fails to deliver the safe and nurturing environment it promises parents and taxpayers***. The Bear Cave finds that toddlers escape from the KinderCare daycares onto busy roads, are left alone locked inside KinderCare buildings and buses, and are physically, verbally, and sexually abused, with many cases going unreported until bystanders raise alarm or video evidence circulates. In sum, ***The Bear Cave believes KinderCare is a broken business that harms the children and families it claims to help***.

209.    The Bear Cave Report detailed multiple instances of child trauma at Company facilities, several of which have been already noted above. For instance, the Bear Cave Report reported on the incident in a Wisconsin Company facility noted above, in which an eleven month old child was exposed to cocaine later found in a staff member's improperly stored backpack. The Bear Cave Report noted that the facility noted above had already sustained multiple safety violations, including "***staff being aggressive with infants***," "***undocumented injuries***," and "***access to power tools and toxic chemicals***."

210.    The Bear Cave Report also reported on an incident at a Company facility in North Carolina, in which a three-year-old toddler was discovered wandering the streets outside the facility.

211.    Moreover, the Bear Cave Report discussed an incident at a Company facility in Florida where staff members locked a two-year-old child alone inside the facility after the child's mother failed to return on time. The two-year-old child was only released from the facility after

Page 65 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

the child's mother called the police who pried the door open. The Bear Cave Report noted an incident at another Florida facility in which a staff member was arrested for child abuse for allegedly "'*yelling at the victim and repeatedly punching the child with both an open and closed fist to the back and side of the head.*'"

212.    The Bear Cave Report further detailed an incident at a Company facility in Washington, where a staff member continually poured water on a sleeping child while another staff member recorded the abuse for social media. Moreover, the Bear Cave Report provided information from "former KinderCare employees" which noted that the Company "didn't always follow licensing."

213.    In addition, the Bear Cave Report reported the following related incidents which occurred at the Company over the previous two years: (1) a KinderCare director "charged with 89 counts of child endangerment;" (2) a KinderCare staff member "fired after an apparent drug overdose;" (3) a KinderCare facility losing its license after "three dozen violations in the span of a few months;" (4) a KinderCare facility that did not properly conduct "criminal history record checks;" (5) a KinderCare staff member "put on leave after a minor was allegedly injured;" (6) a staff member at KinderCare who was arrested for "aggravated battery to a child under the age of 13;" (7) a KinderCare center facing license revocation on "numerous violations for corporal punishment, isolating children, not letting them play outdoors, lack of supervision, and a serious injury;" (8) an abuse allegation leading to a criminal investigation at a KinderCare facility, concerning in which the "parent only learned after police called her;" and (9) a KinderCare employee arrested last month [March 2025] for "for slapping a toddler."

214.    Following the Bear Cave Report, the Company provided a response to news outlets on April 3, 2025, stating the following, in relevant part:

Page 66 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

We are aware of this report [i.e., the Bear Cave Report]. These were isolated incidents and not reflective of KinderCare's values and the high standards we set for ourselves. In the event that incidents do happen in our centers, we have a *strict protocol* to promptly notify families and licensing agencies. *We also work quickly to resolve issues directly with families by taking accountability and addressing what went wrong*. To that end, in each of these referenced incidents, *we conducted an investigation and have taken all actions necessary* to ensure the safety of the children in our care, including *the termination of teachers who were at fault*.

215.     On this news, the price per share of the Company's stock fell $1.59, or approximately 12.4%, from a price per share of $12.78 at the close of trading on April 2, 2025 to close at $11.19 at the close of trading on April 3, 2025.

### April 25, 2025 Evie Article

216.     The revelations contained in the Bear Cave Report were swiftly taken note of by analysts, media outlets, and even members of the United States House of Representatives. For instance, on April 25, 2025, the online magazine Evie published an article titled "Why Are Babies Testing Positive For Cocaine At The Nation's Biggest Daycare Chain?" (the "Evie Article"). The Evie Article stated that the Bear Cave Report was a "*damning new investigative report [that] has pulled back the curtain on what might be the worst scandal in America's childcare system at KinderCare*."[7] Moreover, the Evie Article postulated that the "long list of scandals begs the question: How many isolated incidents does it take before it starts to become a pattern?"[8]

### May 6, 2025 U.S. Representative Luna X Post

217.     On May 6, 2025, U.S Representative Anna Paulina Luna published a post on the social media entity "X," noting that she was conducting an investigation into federal subsidies

---

[7] https://www.eviemagazine.com/post/why-are-babies-testing-positive-for-cocaine-at-the-nation-s-biggest-daycare-chain.

[8] *Id*.

Page 67 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

granted to the Company based on the contents of the Bear Cave Report (the "Rep. Luna Post").

The Rep. Luna Post stated that "*We'll be writing to House leadership and DOGE to address this disgusting report. If you can't keep children safe – and worse, are complicit in their abuse – you do NOT deserve a dime of taxpayer funding*."[9]

218.    The Rep. Luna Post is included in full below:



---

[9] https://x.com/RepLuna/status/1919575463166398546.

Page 68 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

*June 24, 2025 Insider Monkey Article*

219.    On June 24, 2025, the online publication Yahoo! Finance published an article by Insider Monkey titled "KinderCare Learning Companies, Inc. (KLC): A Bear Case Theory" (the "Insider Monkey Article"). The Insider Monkey Article noted that "[w]e came across a bearish thesis on KinderCare Learning Companies, Inc.,"[10] and stated the following with regard to the Bear Cave Report and the Company, in relevant part:[11]

> . . . an investigation by the Bear Cave *reveals a stark disconnect between KinderCare's public image and its operational reality*. . . . While KinderCare pursue public market expansion, *these systemic failures raise grave concerns about the company's foundational promise*. Rather than offering safety and early education, the investigation suggests *KinderCare's model may be fundamentally broken*—leaving children, families, and taxpayers at risk.

220.    Moreover, the Insider Monkey Report stated that its "*concern is not business model obsolescence but systemic operational failure. . . . KLC's risk is reputational implosion from documented safety violations*."[12]

221.    On this news, the price per share of the Company's stock fell $0.09, from a price per share of $9.95 at the close of trading on June 24, 2025 to close at $9.86 at the close of trading on June 25, 2025.

*May 13, 2025 Press Release and Earnings Call*

222.    The truth continued to emerge on May 13, 2025, after the market closed, when the Company issued the Q1 FY 2025 Press Release. The Q1 FY 2025 Press Release noted a decrease in same-center occupancy "predominantly driven by lower enrollment at same-centers." That same day, the Company hosted the Q1 FY 2025 Earnings Call. During the Q1 FY 2025 Earnings

---

[10] https://finance.yahoo.com/news/kindercare-learning-companies-inc-klc-202650348.html.

[11] *Id.*

[12] *Id.*

Call, Defendant Thompson stated that, while the Company "believe[s] the fundamentals underpinning our business are unchanged and remain confident in our long-term growth algorithm for the years ahead," there is a "macro situation that we're experiencing" and "macro conditions [that] are more specific to enrollment and occupancy."

223.    Later on during the Q1 FY 2025 Earnings Call, Defendant Thompson stated the following:

> [W]e employ robust protocols and practices that support the overall well-being of our employees and the children in our care. Our commitment to this belief is resolute and unwavering. When issues arise, we quickly assess the situation, initiate transparency with parents and local regulators, self-report even minor infractions to licensing bodies, and take immediate corrective actions as warranted. *Over the past quarter, we have fielded a number of questions on potential impacts of federal funding changes or efficiency efforts by the current administration on our business*.

224.    On this news, the price per share of the Company's stock fell $1.15, or approximately 8.5%, from a price per share of $13.46 at the close of trading on May 13, 2025 to close at $12.31 at the close of trading on May 14, 2025.

### *August 12, 2025 Press Release and Earnings Call*

225.    The truth continued to emerge on August 12, 2025, after the market closed, when the Company hosted the Q2 FY 2025 Earnings Call. During the Q2 FY 2025 Earnings Call, the Individual Defendants disclosed persistent "enrollment challenges[,]" that "enrollment and occupancy . . . came in below our expectations for the quarter," and a decline in same center occupancy of "roughly one to two children per center across our portfolio."

226.    In addition, during the Q2 FY 2025 Earnings Call, the Individual Defendants revealed that, contrary to the Company's previous representations, the issue facing the Company was not macro but rather that "*the issue is more center-level and local market-specific*." Defendant Thompson provided further explanation, stating the following:

Page 70 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

As part of our performance benchmarking process, we regularly assess center-level trends to identify both strengths and areas of opportunity. *Late last year, that analysis surfaced a number of centers with growth opportunities where additional support and focus will help to unlock their potential. We have since aligned these centers into what we call our opportunity region*.

227.    Also during the Q2 FY 2025 Earnings Call, Defendant Thompson conceded that the Company's underperforming facilities were only "***now*** benefitting from the same proven practices and frameworks that have driven strong results in our highest performing centers." Defendant Thompson also intimated that "teacher turnover" may serve as a contributing factor to center-specific declines.

228.    On this news, the price per share of the Company's stock fell $2.19, or approximately 22.3%, from a price per share of $9.81 at the close of trading on August 12, 2025 to close at $7.62 at the close of trading on August 13, 2025.

### September 8, 2025 Goldman Sachs Conference

229.    The truth continued to emerge on September 8, 2025, after the market closed, when Company executives represented the Company at the 2025 Goldman Sachs Conference. During the 2025 Goldman Sachs Conference, Defendant Amandi asserted that the Company's lackluster financial performance was not due to macroeconomic factors but instead due, in part, to the Company's failure to hire and retain adequate staff. More specifically, Defendant Amandi stated the following:

> Yeah. So, look, we see at each one of our centers, *we're able to diagnose what's happening there and what we can do about it*. And so, you've heard us say, George, obviously, referencing it's at a local level rather than macro across the board. And as we look at some of the items that might be macro as far as job rates or pricing or anything like that, we're not seeing anything that's impacting all our centers. ***And we do have the tools to look at it at a center level and diagnose what's going on***.
>
> ***<u>The most often things are something related to teacher turnover</u>. So we're still able to get all the teachers we need, but we got to make sure we keep especially***

*the lead teachers in place*. And so, if teacher turnover spikes, it usually has some *impacts on the amount of children we can serve because families want to see that stability*. So, that's something we can lean in with the center directors and make sure we lean into our engagement and we're doing what we need to keep those teachers around.

230.   On this news, the price per share of the Company's stock fell $0.14, or approximately 2%, from a price per share of $7.50 at the close of trading on September 8, 2025 to close at $7.36 at the close of trading on September 9, 2025.

## The Truth Fully Emerges

### *November 12, 2025 Press Release and Earnings Call*

231.   The truth fully emerged on November 12, 2025, when the Company issued a press release to announce its financial results for the third quarter of the 2025 Fiscal Year. That same day, the Company hosted the Q3 FY 2025 Earnings Call. During the Q3 FY 2025 Earnings Call, Defendant Amandi stated that "it's clear the recovery in enrollment occupancy is going to take longer than we expected."

232.   On this news, the price per share of the Company's stock fell $0.96, or approximately 19.2%, from a price per share of $5.00 at the close of trading on November 12, 2025 to close at $4.04 at the close of trading on November 13, 2025. As the market continued to react to the Company's disclosures, the price per share of its stock fell an additional $0.09, or approximately 2%, from a price per share of $4.04 at the close of trading on November 13, 2025 to close at $3.95 at the close of trading on November 14, 2025.

## The Individual Defendants' Knowledge

233.   Throughout the Relevant Period, the Individual Defendants had access to internal metrics regarding the Company's involvement in the Safety and Labor Misconduct and the negative impact such involvement would have on its financial prospects. The Individual

Page 72 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Defendants' knowledge as to the materially false and misleading nature of the statements they made is evident through the accounts of several former employees of the Company.

234.    For instance, FE-5 reported in the Securities Class Action that Company facilities faced with an unworkable situation as Company policy would only permit the hiring of new staff following an increase in enrollment, while the only method to increase enrollment was to first hire adequate new staff. FE-5 stated that this requirement was discussed in Company meetings but never put into writing.

235.    Similarly, FE-4 reported that Company policy required facility directors to engage in "*the KinderCare shuffle*," in which classes would be combined to reduce teacher and staff hours and thus cut costs. FE-4 stated that "everyone" at her level in the Company complained about the practice, and added that the practice was Company-wide.

236.    Moreover, FE-3 explained that the Company often employed her to oversee facilities that the Company itself deemed to be in crisis. As such, FE-3 spent eight months to one year at each failing facility before the Company dispatched her to the next one.

237.    FE-1 reported that the Company's issues deriving from its drastic cuts to labor standards during her tenure with the Company were presented to Company management on a "daily" basis. More specifically, FE-1 reported that these issues were repeatedly brought to the attention of Canavin, who in turn reported to the Company's CEO. Notably, FE-1 stated that President Canavin consistently disregarded concerns brought to him about the cuts to the Company's standards, including labor standards.

238.    Moreover, FE-1 added that Canavin did visit Company facilities, but when doing so he downplayed facility director concerns about staffing. For example, when facility directors would note their difficulties in adequately staffing rooms, Canavin's only response was to ask

Page 73 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

"when can you have a teacher by[.]" FE-1 further reported on a similar incident at a Company facility in Alexandria, Virginia, in approximately April 2023. At that time, Canavin once again ignored the facility director and instructed them to grow enrollment prior to hiring additional teachers.

239.    Regarding the Company's inadequate staff compensation, FE-2 reported that she and her colleagues "*constantly*" raised their concerns about staff compensation to their supervisors. These supervisors included Jeffery Talkington, current Manager of Client Implementation and Adoption at KinderCare. Jeffery Talkington reported to Amy Harmon, a former Vice President, Client Success and Senior Director, Implementation for the Company, who likewise reported to Joshua Noda, who currently serves the Company as the Vice President, Operations.

240.    Moreover, FE-2 reported that her and her colleagues' concerns were discussed at various "round table" meetings with Canavin. As noted elsewhere above, FE-2 stated that Canavin and other Company leaders "brushed off" such concerns, who attributed the issues facing the Company to "the industry." Notably, FE-2 stated that these concerns continued to be brought up prior to the IPO.

241.    Also regarding the Company's inadequate staff compensation, FE-1 noted that the Company hosted weekly meetings in which Canavin met with his direct subordinates, such as FE-1's supervisor Anissa Walker. FE-1 explained that the issues of pay, staffing, and care quality were discussed during these meetings. FE-1 asserted that she brought the various labor issues up to Anissa Walker between two and three times per week and added that Anissa Walker and Canavin spoke regularly.

Page 74 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

242.     FE-1 stated that she met with Anissa Walker and her team virtually once a week, with the team's human resources and finance partners also in attendance. FE-1 noted that the labor issues affecting the Company were discussed regularly, if not at every meeting. Moreover, FE-1 described the concerns surrounding these labor issues as a "pinch point" for everyone.

243.     Moreover, FE-1 reported that while Canavin was regularly presented with the various labor issues facing the Company, he "would not budge[.]" Rather, Canavin blamed exiting teachers and other staff for their lack of "commit[ment.]"

244.     In addition, FE-1 stated that the Company's C-suite viewed the information contained in Anaplan pertaining to labor targets and utilized such information in creating future labor hours budgets.

245.     The accounts of the Company's former employees noted above demonstrate that issues surrounding the Company's involvement in the Safety and Labor Misconduct were well known throughout all levels of the Company. Moreover, the accounts of the Company's former employees demonstrate that such issues were repeatedly raised up through the Company's executive hierarchy but consistently ignored or downplayed. As such, the Individual Defendants were made aware of the issues surrounding the Company's involvement in the Safety and Labor Misconduct.

### DAMAGES TO KINDERCARE

246.     As a direct and proximate result of the Individual Defendants' conduct, KinderCare has lost and expended, and will continue to lose and expend, many millions of dollars.

247.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action

filed against the Company, its CEO, its former CEO, its CFO, and the Board, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

248. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the Safety and Labor Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

249. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations, including the numerous actions discussed herein taken by the Massachusetts Attorney General, the Company's former students, and the Company's former employees.

250. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

251. As a direct and proximate result of the Individual Defendants' conduct, KinderCare has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

252.     Plaintiff brings this action derivatively and for the benefit of KinderCare to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as officers and directors of KinderCare, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and for violations of the Securities Act.

253.     KinderCare is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

254.     Plaintiff is, and has been at all relevant times, a shareholder of KinderCare. Plaintiff will adequately and fairly represent the interests of KinderCare in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

255.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above, as though fully set forth herein.

256.     A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Wyatt, Desravines, Deputy, Nuzzo, Schwartz, and Waxenberg (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the Directors-Defendants who were on the Board at the time this action commenced.

257.     Demand is excused as to all the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the

Page 77 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Safety and Labor Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

258.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted KinderCare to engage in the Safety and Labor Misconduct and to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls while three of the Individual Defendants engaged in lucrative insider sales netting proceeds of approximately $526,494. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

259.    Additional reasons that demand as to Defendant Wyatt is futile follow. Defendant Wyatt has served as the Company's CEO since December 2, 2025. Defendant Wyatt has also served as a Company director since 2012, and as the Chairman of the Board since September 2021. Previously, Defendant Wyatt served as the Company's CEO from 2012 to 2024. The Company provides Defendant Wyatt with his principal occupation for which he receives handsome compensation. Thus, Defendant Wyatt is not an independent director. As the Company's trusted CEO and Chairman of the Board, Defendant Wyatt conducted little, if any, oversight of the schemes to cause the Company to engage in the Safety and Labor Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his

duties to monitor internal controls over reporting and engagement in the schemes. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Wyatt signed the materially false and misleading Registration Statement. Defendant Wyatt also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendant Deputy and the election of Defendant Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Wyatt's insider sales while the Company's stock was artificially inflated as a result of the false and misleading statements herein, also demonstrate his motive in facilitating and participating in the schemes. Further, Defendant Wyatt is a defendant in the Securities Class Action. For these reasons, Defendant Wyatt faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

260. Additional reasons that demand as to Defendant Desravines is futile follow. Defendant Desravines is the Lead Independent Director of the Board and has served as a Company director since 2021. Defendant Desravines currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. The Company provides Defendant Desravines with handsome compensation for his role as a director. As a trusted, long-time Company director, Defendant Desravines conducted little, if any, oversight of the schemes to cause the Company to engage in the Safety and Labor Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes. In addition, during the Relevant Period, he failed to correct the false and misleading

statements alleged herein. Defendant Desravines signed the materially false and misleading Registration Statement. Defendant Desravines also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendant Deputy and the election of Defendant Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Desravines is a defendant in the Securities Class Action. For these reasons, Defendant Desravines faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

261. Additional reasons that demand on Defendant Deputy is futile follow. Defendant Deputy has served as a Company director since 2021. Defendant Deputy currently serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Deputy with handsome compensation for her role as a director. As a trusted, long-time Company director, Defendant Deputy conducted little, if any, oversight of the schemes to cause the Company to engage in the Safety and Labor Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Deputy signed the materially false and misleading Registration Statement. Defendant Deputy also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of herself and the election of Defendant Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Deputy is a defendant in the

Page 80 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

Securities Class Action. For these reasons, Defendant Deputy faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

262.    Additional reasons that demand on Defendant Nuzzo is futile follow. Defendant Nuzzo has served as a Company director since 2021. Defendant Nuzzo currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee. The Company provides Defendant Nuzzo with handsome compensation for his role as a director. As a trusted, long-time Company director, Defendant Nuzzo conducted little, if any, oversight of the schemes to cause the Company to engage in the Safety and Labor Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Nuzzo signed the materially false and misleading Registration Statement. Defendant Nuzzo also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendant Deputy and the election of Defendant Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Nuzzo is a defendant in the Securities Class Action. For these reasons, Defendant Nuzzo faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

263.    Additional reasons that demand on Defendant Schwartz is futile follow. Defendant Schwartz has served as a Company director since 2015, and currently serves as a member of the Compensation Committee. The Company provides Defendant Schwartz with

Page 81 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

handsome compensation for his role as a director. As a trusted, long-time Company director, Defendant Schwartz conducted little, if any, oversight of the schemes to cause the Company to engage in the Safety and Labor Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Schwartz signed the materially false and misleading Registration Statement. Defendant Schwartz also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendant Deputy and the election of Defendant Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Schwartz is a defendant in the Securities Class Action. For these reasons, Defendant Schwartz faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

264.    Additional reasons that demand on Defendant Waxenberg is futile follow. Defendant Waxenberg has served as a Company director since 2021, and currently serves as a member of the Audit Committee. The Company provides Defendant Waxenberg with handsome compensation for her role as a director. As a trusted, long-time Company director, Defendant Waxenberg conducted little, if any, oversight of the schemes to cause the Company to engage in the Safety and Labor Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes. In addition, during the Relevant Period, she failed to correct the

Page 82 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

false and misleading statements alleged herein. Defendant Waxenberg signed the materially false and misleading Registration Statement. Defendant Waxenberg also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendant Deputy and the election of Defendant Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Waxenberg is a defendant in the Securities Class Action. For these reasons, Defendant Waxenberg faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

265.    Additional reasons that demand on the Board is futile follow.

266.    Defendants Nuzzo (as Chair), Desravines, and Waxenberg (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty, violations of the Exchange Act, and violations of the Securities Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

Page 83 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
4282152

267. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to engage in the Safety and Labor Misconduct and to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and violations of the Securities Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

268. KinderCare has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for KinderCare any part of the damages KinderCare suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

269. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit Committee Charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment

Page 84 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

270. The acts complained of herein constitute violations of fiduciary duties owed by KinderCare's officers and directors, and these acts are incapable of ratification.

271. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of KinderCare. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of KinderCare, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

272. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause KinderCare to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

4282152

273.    Thus, for all the reasons set forth above, all the Director-Defendants, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty for Violations of Section 14(a) of the Exchange Act**

274.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

276.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

277.    Under the direction and watch of Defendants Thompson, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty, the 2025 Proxy Statement failed to disclose: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without

Page 86 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

278.    The 2025 Proxy Statement failed to disclose that: (1) the Company engaged in the Safety and Labor Misconduct; (2) the Company's violations of state laws and regulations resulted in the substantial withdrawal of families from its facilities; (3) the withdrawal of families from Company facilities would negatively impact its enrollment figures; (4) as a result, the Offering Documents' risk statements were not merely speculative given that purported risks had already occurred and continued to occur; (5) as a result of the Safety and Labor Misconduct, the Company has been subjected to numerous lawsuits by families and former employees as well as state regulatory action; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

279.    In exercise of reasonable care, Defendants Thompson, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement including, but not limited to, the re-election of the Director-Defendants.

280.    As a result of Defendants Thompson, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty causing the 2025 Proxy Statement to be false and misleading,

Company shareholders voted, *inter alia*, to: (1) re-elect Defendant Deputy and elect Defendant Thompson to the Board to serve until the 2028 annual meeting of the stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP at the Company's independent registered public accounting firm for the fiscal year ended January 3, 2026; (3) approve, on advisory basis, the compensation of the Company's named executive officers; and (4) approve, on advisory basis, the frequency of the future advisory votes on compensation paid to the Company's named executive officers.

281. The Company was damaged as a result of Defendants Thompson's, Wyatt's, Desravines', Deputy's, Nuzzo's, Russell's, Schwartz's, Waxenberg's, and Grasty's material misrepresentations and omissions in the 2025 Proxy Statement.

282. Plaintiff, on behalf of KinderCare, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

283. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of KinderCare's business and affairs.

285. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

286. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The

Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of KinderCare.

287.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Safety and Labor Misconduct.

288.    Also in breach of their fiduciary duties owed to KinderCare, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company engaged in the Safety and Labor Misconduct; (2) the Company's violations of state laws and regulations resulted in the substantial withdrawal of families from its facilities; (3) the withdrawal of families from Company facilities would negatively impact its enrollment figures; (4) as a result, the Offering Documents' risk statements were not merely speculative given that purported risks had already occurred and continued to occur; (5) as a result of the Safety and Labor Misconduct, the Company has been subjected to numerous lawsuits by families and former employees as well as state regulatory action; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

289.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

290.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, while Defendants Thompson, Amandi, and Wyatt engaged in lucrative insider sales, netting collective proceeds of approximately $526,494.

Page 89 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

291. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

292. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of KinderCare's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

293. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

294. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, KinderCare has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

295. Plaintiff, on behalf of KinderCare, has no adequate remedy at law.

Page 90 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

296.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

297.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, KinderCare.

298.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from KinderCare that was tied to the performance or artificially inflated valuation of KinderCare, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

299.    Plaintiff, as a shareholder and representative of KinderCare, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

300.    Plaintiff, on behalf of KinderCare, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

301.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Page 91 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

302.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence KinderCare, for which they are legally responsible.

303.    As a direct and proximate result of the Individual Defendants' abuse of control, KinderCare has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, KinderCare has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

304.    Plaintiff, on behalf of KinderCare, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

305.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

306.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of KinderCare in a manner consistent with the operations of a publicly held corporation.

307.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, KinderCare has sustained and will continue to sustain significant damages.

308.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

309.    Plaintiff, on behalf of KinderCare, has no adequate remedy at law.

4282152

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

310. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

311. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

312. As a further result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused KinderCare to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

313. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

314. Plaintiff, on behalf of KinderCare, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Thompson, Amandi, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty for Contribution Under Sections 11(f) of the Securities Act and Section 21D of the Exchange Act

315. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

316. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of KinderCare shareholders, in which it is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act.

317.    Federal law provides KinderCare with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

318.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

319.    KinderCare is the registrant for the IPO. Defendants Thompson, Amandi, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty were responsible for the contents and dissemination of the Registration Statement.

320.    As issuer of the shares, KinderCare is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

321.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

322.    Defendants Thompson, Amandi, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty, because of their positions of control and authority as controlling shareholders, officers and/or directors of KinderCare, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of KinderCare, including the wrongful acts complained of herein and in the Securities Class Action.

323.    Accordingly, Defendants Thompson, Amandi, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D

Page 94 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

324.    As such, KinderCare is entitled to receive all appropriate contribution or indemnification from Defendants Thompson, Amandi, Wyatt, Desravines, Deputy, Nuzzo, Russell, Schwartz, Waxenberg, and Grasty.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of KinderCare, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to KinderCare;

(c)    Determining and awarding to KinderCare the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing KinderCare and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KinderCare and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

Page 95 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of KinderCare to nominate at least three candidates for election to the Board; and

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding KinderCare restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED this 24th day of March, 2026.

BLACK HELTERLINE LLP


By:   s/ Michael B. Merchant
Michael B. Merchant
OSB No. 882680
(503) 224-5560
*Liaison Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Page 96 – **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4282152